# Wytheville.

RICHMOND PASSENGER & POWER Co. v. RACKS, ADMINISTRATOR.

June 11, 1903.

1. EVIDENCE—*Expert Testimony—Stopping Street Cars—Comparison of Cars and Conditions.*—Expert testimony as to the distance within which an electric car could have been stopped in a given case should be based upon the operation of cars of similar construction and equipment, and under like conditions.
2. STREET RAILWAYS—*Trespassers on Track—Duty To—Case at Bar.*—A street car company owes no duty of foresight to a trespasser on its track, but only reasonable care to avoid injury after the danger is discovered. In the case at bar, the deceased met her death while crawling over a long trestle on defendant's track on a dark night. In shutting off the current to reduce the speed in going on the trestle the headlight of the car was extinguished, and when it was again turned on the deceased was for the first time discovered by the motorman, so close in front of his car that he was unable to stop before striking her, although he did all in his power to prevent the collision.

Error to a judgment of the Law and Equity Court of the city of Richmond, rendered July 23, 1902, in an action of trespass on the case, wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*H. Taylor, Jr.,* for the plaintiff in error.

*William L. Royall,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

Royall Racks, administrator of Frances Racks, deceased, brought his suit in the Law and Equity Court of the city of Richmond, and recovered a judgment against the Richmond Passenger & Power Company for the sum of $500 damages by reason of the death of the said Frances Racks, caused, as alleged, by the negligence of the defendant.

The circumstances under which the plaintiff's intestate lost her life are as follows:

On the afternoon of March 2, 1902, she, accompanied by her daughter, about 13 years of age, and two other small colored girls, walked out from her home, in the city of Richmond, to look at the high water in the river, and in returning home they were diverted from their route by boys throwing stones at them, and wandered away into the county of Henrico and got lost: About dark they found themselves upon the county road leading from Richmond City to Seven Pines, in the county of Henrico, upon which the defendant's track is laid, and on which it operates electric cars for the transportation of passengers between Richmond City and Seven Pines, and they undertook to follow this road back to Richmond. After going a short distance the party discovered some one with a lamp near the road, and called to him to know the way they should go in order to reach Richmond, and were told to "follow that road; that will put you to Richmond," or "to keep the county road and go straight ahead." A short way from where these instructions were received, the county road deflects to the north for the purpose of crossing a stream that has high banks directly in front of the place or deflection, whilst the electric railroad runs straight along, and crosses the stream upon a trestle, which is about 60 feet high and 415 feet long. This trestle has no walkway upon it, but a person crossing it must step from joist to joist, the joists being about 18 inches apart, with

nothing between them, or under the spaces between them; and there is not room enough on either side of the railway track for a person to stand while one of the defendant's electric cars is passing. Upon reaching the point where the county road and railway track separate, the deceased, with the little girls accompanying her, followed the railway track; and upon reaching the trestle, and finding that they could not walk across it, they got on their knees and hands, and attempted to make their passage over it by crawling from joist to joist; and, when they had gotten beyond the middle of the trestle, one of the defendant's electric cars on its return from Seven Pines to Richmond ran upon and over them, killing the deceased, Frances Racks, at a point about 65 feet from the western end of the trestle.

The approach of the railway track from the east of the trestle is on a down grade, while the trestle itself is level; and upon approaching the trestle the current of electricity is turned off, and the car allowed to roll of its own motion until it reaches about midway of the trestle, when the current is gradually turned on again, to restore sufficient speed to ascend the grade beginning at the west end of the trestle.

It is not controverted that under these circumstances the deceased was a trespasser, and no duty was owing to her by the defendant, except, after it knew of her danger and peril, to exercise reasonable care to avoid injuring her; and therefore the only question in the case is whether or not the motorman in charge of the car did all that he could do in the exercise of reasonable care to stop his car after he discovered her peril.

The undisputed facts proved are that the car of the defendant company which ran upon the deceased is about 42 feet long; that the night of the accident was very dark and very damp—"almost raining"; and that, by reason of the dampness, the track was in the very worst of all conditions for stopping the car.

With the view of proving the distance within which the car might have been stopped, the plaintiff introduced several expert witness—among them, T. E. Felt, superintendent of the Richmond & Petersburg Electric Railway Company, who testified in regard to stopping the cars on his road; and, when recalled a second time for examination, he was permitted, in answer to a question by plaintiff's counsel, over the objection of the defendant, to state that when the current of electricity has stopped the wheels of one of his cars from revolving, or the wheels are made to reverse, so that the car is moving only by its own momentum, it would stop in 40 feet. Evidence having been introduced as to the construction and equipment of the cars of the defendant operated on the Seven Pines Road, showing that they had entirely different machinery from the machinery of the cars on the Richmond & Petersburg Electric Railway, as described by the witness Felt, and that no comparison could properly be made between the equipment or appliances upon the cars operated upon the respective roads, the defendants moved the court to exclude the testimony of Felt, as to stopping cars, which motion was overruled, and this ruling is made the foundation of the defendant's first bill of exceptions.

The court is of opinion that this exception is well taken. No foundation had been laid for the testimony of the witness objected to, by showing similarity between the cars of which he was speaking and the car involved in the accident out of which this suit arises. On the contrary, it had not only been shown that the cars were dissimilar, but that the circumstances existing at the time of the accident were different from those under which the witness testified as to stopping cars on his road. Testimony as to what could be done to avoid injury to a person on an electric car track, with different cars, differently equipped, and under different conditions, instead of being helpful to the jury in reaching a right conclusion as to whether the motorman in charge of the car in question negligently failed to do

all in his power to avoid injury to the deceased after he discovered her peril, was well calculated to lead them away from the pertinent and relevant testimony in the case into the field of conjecture, which, as has often been repeated, cannot be permitted. An inference cannot be drawn from a presumption, but must be founded upon some fact legally established. *N. & W. Ry. Co.* v. *Cromer*, 99 Va. 794, 40 S. E. 54.

The two remaining exceptions taken by the defendant may be considered together. The one relates to the giving of an instruction asked by the plaintiff, and the other to the refusal of the court to award a new trial on the ground that the verdict is contrary to the law and the evidence.

The instruction referred to, and the only instruction given for the plaintiff, is as follows:

"The jury are instructed that if they believe from the evidence that the motorman in charge of the defendant's car on the evening of March 2, 1902, could, by the exercise of ordinary care, have prevented said car from running on the deceased after he saw her, that they are instructed that it was his duty to prevent said car from running on the deceased, and if they believe further from the evidence that he neglected said duty, and that the death of deceased was due to such neglect of duty, the defendant is liable for such neglect of duty, and in that case their verdict should be for the plaintiff."

It is not claimed that the instruction propounds an incorrect proposition of law, but the contention is that there was not sufficient evidence to warrant the court in giving it. We do not deem it necessary to consider this contention, as we are called upon to determine whether or not the evidence is sufficient to sustain the verdict of the jury.

The first witness for the plaintiff was R. A. Powell, the motorman of the car. He testified that he was not certain as to where he was when he first saw these people on the trestle; it was hard to tell in the dark, and he could not be positive.

But he explains that; in order to reduce the speed of the car when entering upon the trestle, so as to go upon it at a low rate of speed, the current of electricity is cut off, which so reduces the headlight that nothing could be seen in front until the current was put on again, when the headlight is revived; that, as was usual, the current had been cut off, and he began to feed his car up (by applying the electricity) about the center of the trestle, or when he supposed he was about the center, and it takes some time to feed it up to nine points, needed to ascend the grade beginning at the west end of the trestle; that he had fed it up to nine points, and was running on nine points when he first saw these people. He thereby explains that he was several car lengths past the center of the trestle when he saw them, and instantly applied his brake, reversed his current, and made the best stop he could, using all the means in his power to prevent the accident. In answer to the question, "There is no guessing on your part that instantly you saw those people you tried to stop the car in every way you could?" the witness said: "I did in every way I could to prevent the accident. I don't believe a man ever worked on a car more faithfully than I did, trying to stop it."

The car, as we have observed, was about 42 feet long, and the deceased was run over 65 feet from the western end of the trestle; that is, about 142 feet from the middle of the trestle, approaching from the east. The witness was not asked how close he thought he was to those people when he first saw them, nor as to how far the car ran beyond the point of the accident before it stopped; but, from the explanation he makes as to how he handled the car (that the headlight would only light the trestle in front about 40 feet when feeding the car up), if he had run, as he stated, 2 1-2 car lengths past the middle of the trestle while feeding the car up, the only inference that could have been drawn was that he was in less than 40 feet of the people when he first saw them. The statement of the witness

of the defendant, L. V. Mayor, who was a passenger standing by the motorman, Powell, in no way conflicts with the latter's testimony, but corroborates the statement he made that the car was too close when the people were seen to be stopped in time to avoid running over them. Mayor says that the reversing of the car attracted his attention, and, looking forward, he saw the people about 40 feet off.

Another witness for the defendant, who was a passenger on the car, and standing near the motorman, also corroborates the latter in the statement that he did everything in his power to stop the car before reaching these people.

Plaintiff's witness, R. W. Jennings, testified that a car running eight miles an hour, the supposed speed of the car at the time of this accident, on a dead level and a dry rail, could be stopped in 40 feet; on a wet rail, with the use of sand, it would take only five feet further, but, if you did not have sand, it would take ten feet more, maybe longer than that. He could not tell, however, about a slick rail—as was the case here—how long it would take to stop the car, and he concurs in the statement of other witnesses that the current of electricity cannot be reversed, so as to bring the wheels to a dead stop, or make them go back instantly, as it takes at least two seconds to give it time to "get in"; that is, to take hold and have effect.

Annie Racks, the 13-year-old daughter of the deceased, as a witness for the plaintiff, testifies that the light on the car went out just as the car reached the eastern end of the trestle, and that the light came on no more until the accident was over and the car had gotten across the trestle. She, as stated by all the other witnesses, says that it was a dark night, and in this darkness, while she was crawling upon her hands and knees over the trestle, she claims that she saw the motorman turning "all around the brakes" (meaning, doubtless, turning the brakes around) when the car was the distance of the width of Broad street from her; that the light did not go out until the car

was as close to her as across Broad street; and that they were then about the middle of the trestle. It appears that the witness saved her life by swinging under the trestle at the point where her mother was killed, while one of the remaining two of the party jumped off the trestle, and the other was knocked·off; and all this occurred at a point, as we have seen, 65 feet from the western end of the trestle, and at least 142 feet west of its center, so that, in the very nature of things, as well as by the plaintiff's other evidence in the case, it is impossible that this witness' statement that the lights on the car went out as it entered upon the east end of the trestle, and never came on again until it had passed over the trestle, can be true. But if the statement be accepted as true, it neither proves as a fact, nor warrants the inference, that the motorman in charge of the car failed to do, as he states he did, all in his power to stop his car after he discovered these people on the trestle. On the contrary, the plaintiff's other evidence conclusively proves that if the statement of Annie Racks be true—that the lights on the car went out as it entered upon the east end of the trestle, and remained out until it passed entirely over it—it was impossible that the motorman could have at any time seen these people on the trestle before running over them. It is not pretended that he saw them from the east end of the trestle, where, as Annie Racks claims, the light went out, and never came on again, for, if such were the case, he wantonly or recklessly ran his car upon them; and it is conceded by counsel in argument here that such was not the case, the contention being only that when the motorman saw the deceased's peril he became so awe-stricken that he lost ability to deal effectually with the situation.

Subjecting the whole evidence to the most rigid application of the rule governing demurrers to evidence, no other conclusion could rightly be reached than that the death of the de-

ceased was due solely to her own reckless intrusion upon the defendant's trestle and right of way as a trespasser.

It follows that the judgment of the lower court refusing to set aside the verdict of the jury and award the defendant a new trial must be reversed and annulled, and the cause remanded.

*Reversed.*