104 400
104 757

'104 400
107 377
107 411
107 893

Syllabus.

104 400
110 617

# Staunton.

## WISE TERMINAL COMPANY v. McCORMICK.

### September 14, 1905.

1. NEGLIGENCE—*Case at Bar—Contributory Negligence.*—The evidence in this case wholly fails to show actionable negligence on the part of the defendant, and hence the plaintiff was not entitled to recover. The plaintiff, an employee of the defendant, while off duty, at an unexpected time and place, stepped into the middle of the defendant's railroad track in front of a slowly moving engine and tender, which were backing, and attempted to get on the step or foot-board on the rear of the tender, upon which was placed an oil can, and fell under the tender and was injured. The engine and tender were properly equipped and managed for the work required, and the engineer used due diligence to stop the train as soon as the plaintiff's peril was discovered. It was not reasonably necessary or proper for the plaintiff to take the risk he took in order to accomplish the purpose he had in mind in attempting to board the tender.

2. NEGLIGENCE—*When Not Imputed.*—Negligence cannot be imputed to one unless he has done something which he knew or had reason to believe might cause injury to another.

3. EVIDENCE—*Experts—Speed of Train.*—Expert testimony as to the speed at which a train was running, or the distance within which it might have been stopped, will not be received unless based upon the operation of cars or engines of similar construction and equipment, and under like circumstances.

4. MASTER AND SERVANT.—*Two Modes of Doing Work—One Safe, Another Dangerous.*—Where an employee is confronted with two methods of doing work, the one safe and the other dangerous, he owes a positive duty to his employer to pursue the safe method irrespective of the degree of danger involved in the unsafe method, and any departure from the path of safety will prevent his recovery, if injured.

5. NEGLIGENCE PRODUCING EMERGENCY.—One who, by his own negligence, has placed another in an emergency, cannot require of that other the wisest possible action in order to save him from the consequences of his own fault.

6. Negligence—*Contributory Negligence—Case at Bar.*—Upon the evidence in this case, if the negligence of the defendant's servant be conceded, it clearly appears that the plaintiff's right of recovery is barred by his concurring negligence at the time the injury complained of was inflicted.

Error to a judgment of the Circuit Court of Wise county, in an action of trespass on the case.    Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Ayers & Fulton* and *Bullitt & Kelly,* for the plaintiff in error.

*William H. Werth,* for the defendant in error.

Cardwell, J., delivered the opinion of the court.

The defendant in error, W. B. McCormick, brought this action and recovered in the Circuit Court of Wise county, a verdict and judgment against the plaintiff in error, Wise Terminal Company, which was the defendant in the court below, for $5,000 as damages for personal injuries alleged to have been inflicted upon him by the negligence of the defendant company.

In the view taken by this court, there was a total failure on the part of the plaintiff to trace actionable negligence to the defendant company, and in no aspect of the case was he entitled to a verdict.    Therefore, it is unnecessary to notice in detail the numerous assignments of error other than the refusal of the trial court to set aside the verdict on the ground that it was contrary to the law and the evidence.

The Wise Terminal Company, operates a line of railroad about six miles in length, extending from the town of Glamor-

gan, in Wise county, to the town of Norton, in the same county. The business conducted by the company, at the time of the injuries received by the plaintiff, consisted of two passenger trains between the two points named, one in the morning and the other in the evening, and the carrying of freight between the same points.

In carrying on this business, the defendant company found it necessary to purchase and use only one engine and one passenger car, the freight cars being furnished by connecting roads. The engine used, though second hand, was duly inspected before it was purchased by the defendant company by competent inspectors, and pronounced reasonably safe and suitable for the work required of it. In fact, according to the undisputed evidence in the case, was more desirable, and much safer on the new road-bed which the defendant company was operating than a new engine would have been. The defendant company employed competent men to manage and conduct its business, and among other of its employees was the plaintiff, McCormick, who was a brakeman well versed in railroad rules, who usually performed his duties reasonable well, but had fallen into the habit of drinking ardent spirits to excess at times. His duties were those of an ordinary brakeman, and to keep one of the two keys to the passenger coach from the time he went on duty at seven o'clock A. M., till about 7:30 P. M., when he was to lock the passenger coach and deliver the key to another employee, Taylor, and thereupon his (McCormick's) duties and employment ceased for the day, and it became the duty of Taylor, as the night watchman (or "hostler") to take charge of the engine and passenger coach, and keep them in charge during the night. He, Taylor, was also to clean, oil, sand, water, and coal the engine, clean up the passenger coach, and have them ready for the first passenger run from Glamorgan to Norton the next morning. No one besides Taylor had anything to do with the engine or passenger coach after the last or night passenger run from Norton to Glamorgan was completed; the en-

gine and passenger coach remaining at Glamorgan for the night in the exclusive custody and control of Taylor, with no reason whatever for him to expect any one to come about them.    There was no regular round-house for the protection and care of this one engine, and, in the performance of his duties in cleaning said engine and getting the same ready for duty on the road early next morning, it became necessary to use kerosene oil, and for this purpose there was kept in the passengar coach a five gallon can of such oil, which Taylor, the night watchman, would use and then return to its place in the passenger coach. The road being new and the grounds muddy, it frequently became necessary for the night watchman, in the performance of his duties, to detach the engine and take it to a certain switch in the yard, where, on account of the increased width of the level space at the switch, he could stand the engine and more easily, and with less contact with the mud, get around it, and do the necessary cleaning and other work upon it.    After the necessary cleaning and oiling was done, the night watchman would take the engine back down the main track respectively to the places where he could sand, coal, and oil it, and then attach it to the passenger coach, to be followed by sweeping out the passenger coach and otherwise putting it in proper condition for the first passenger run leaving Glamorgan about 7:00 o'clock the next morning; the night watchman remaining in charge until the next morning, when he delivered the engine and coach to the crew which made the runs between Glamorgan and Norton, said crew including the plaintiff, McCormick, who had no duties or business on the engine or coach from about 7:30 o'clock P. M., the previous evening until 7:00 o'clock the next morning.   When the night watchman would get his engine clean, and start it back for sand, water and coal, and to be attached to the passenger coach, he would of necessity place the oil can on a certain step affixed to the rear end of the tender of the engine and extending entirely across the tender, which was, according to the evidence, the only place where the oil can could be safely

placed while carrying it back to its final destination in the passenger coach, and it was the custom to so carry it from the passenger coach to the point where the engine was cleaned and oiled and backed to the passenger coach when the work of cleaning and oiling the engine had been done. Of the two keys to the passenger coach mentioned, the watchman had one, and it was therefore no impediment to him in the discharge of his duties if McCormick (the plaintiff) did not deliver the other key to him when he went off duty until the next morning, hence there was no actual necessity for McCormick, when he went off duty, to give the key he held to the night watchmen, and the only reasons for his doing so were, (1) that he would be observing the rules, and (2) that there would be less risk of some outsider getting hold of the key if given to the night watchman who remained on duty and awake all night. There were no lights on the rear or tender of the engine, and none were necessary as no one was expected or allowed to attempt to get on the engine while it was off duty, and in the charge of the night watchman. As there was but one engine to move on the yard, there was no danger of a collision by reason of the absence of lights, or "markers" on it, and therefore the reason why standard roads with a number of engines and trains constantly moving have these lights or "markers" did not apply. The step that ran across the rear end of the tender and on which the oil can was usually placed, as stated, was a board about nine inches wide, and about one and one-half inches thick, and about seventeen or eighteen inches high from the track, and some eight or nine inches higher than the usual height of such steps. Just why this was so the evidence does not disclose, but it does appear that the danger in attempting to board the engine by getting on said step would be far greater than if it had been of the ordinary height (eight or nine inches), a fact which, by reason of his experience, was well known to McCormick. The engine while in use on the road was not fully equipped with an air brake, though the tender

was so equipped, and from this the air could be made to oper-
ate and control the other parts of the train, and as no great
speed was required or attained in the handling of the defendant
company's trains, this equipment was all that was necessary,
but after the day's work was over even the air brake on the
tender was not required nor used, and the air valve was cut
off, and the engine controlled in the few movements it made on
the yard during the night by the steam brake and reverse
lever.    This was customary with all roads, and was uniformly
followed in the handling of the engine in question on the yard
of the defendant company, and there was no real necessity to
use air brakes when being so handled is apparent.

On July 6, 1903, the last passenger run from Norton to
Glamorgan was made, and the engine, as usual, turned over
to the night watchman, Taylor, in its usual condition, *i. e.*
with the air valve closed.    McCormick, however, for some
reason, forgot to turn over to Taylor the key to the passenger
coach that was in his possession, and which it was his duty to
have delivered to Taylor on the completion of the run about
8:00 o'clock P. M., and which duty McCormick generally per-
formed and had been remiss in doing but a few times before.
In his examination in chief in this case he started out to excuse
his omission on this occasion by the statement that on arriving
at Glamorgan and going off duty for the night he did not see
Taylor, but on cross-examination he frankly admits that he
simply "forgot" it.    He claims that he occupied the time
between 8:00 o'clock P. M. and midnight in writing two let-
ters, and in reading a newspaper, when he discovered that he
had failed to deliver the key to Taylor as he should have done
on arrival of the train and that he then had it in his pocket,
and, although there was no necessity for his doing so, so far as
enabling Taylor to get into the coach was concerned, he started
out in quest of Taylor to deliver to him the key.

Taylor, as usual, had taken the engine up to the switch,
above referred to, for the purpose of cleaning and oiling it,

and McCormick claims that when he came down looking for Taylor to give him the key he went up to the engine and could not discover him there.   He does not claim to have called for Taylor but only that he glanced around to see if he was at the engine.   After failing to see Taylor on the engine, McCormick went down the track to a point under or near what is known in the record as the "Larry Trestle" and there observing that the engine was rolling towards him, he stopped in the middle of the track for the purpose of boarding the tender (which was in front, as the engine was moving backward) by getting on the step across the same, and when the tender rolled on down he made the attempt to so board the tender, but in doing so, as he claims, his foot struck the oil can which Taylor had placed on the step, and it caused him to fall under the tender and the tender and engine ran over him inflicting such injuries that his right arm and right leg had to be amputated. He claims that when he saw he was falling he commenced hallooing; that he caught with his hands on the end of the tender and was dragged a few feet when his hold broke and the tender and the engine passed over him, the latter passing him a few feet before it stopped, but he does not undertake to state definitely the distance the engine ran after he fell or after the accident, which was quite natural under the circumstances.

The theories upon which the plaintiff grounds his claim to damages, were, (1) that Taylor, the night watchman, was incompetent to perform the duties entrusted to him; (2) that Taylor was negligent in placing the oil can on the step across the front of the tender; (3) that the engine was not suitably equipped with air brakes and was not properly lighted; and (4) that Taylor did not stop the engine as soon as he ought to have done after plaintiff fell under it.

There was practically no effort made in the introduction of the evidence to sustain the allegation of the declaration that the defendant company was negligent in using a second-hand engine, nor as to the incompetency of Taylor, the night watch-

man. With reference to the placing of the oil can on the step, the lack of lights or air brakes on the engine, there is absolutely no evidence in the record from which to impute to the defendant company any negligence, whatever; therefore, the instructions to the jury, from one to nine inclusive, given for the plaintiff, all of which were, in one form or another, predicated upon the supposed negligence of the defendant company in the respects mentioned, upon familiar principles ought not to have been given.

It is a fundamental principle of negligence, that one charged therewith must have done something which he knew or had reason to believe might cause an injury to some one else, and unless this is proven negligence cannot be imputed.

In addition to plaintiff's own evidence showing conclusively that no one had any business on the step or foot-board across the rear end of the tender after the train came in and the engine was turned over to Taylor, the uncontradicted statement of Taylor is that no one had any business there, so far as he knew, and, therefore, he was not looking for anybody about the engine, or on the track.

At one point it is alleged and argued that the negligence of the defendant company, with respect to the oil can consisted in a violation of a rule against putting such an obstruction on the step of the engine, and at another that the negligence consisted in not having such a rule. Either contention might have been plausibly made if the accident out of which this suit arises had occurred at a time and place when and where there was any reason whatever to expect that any one would attempt to get upon the step or foot-board of the engine in question, but that is not the case here. Moreover the plaintiff himself testifies that he had with him a regular railroad lantern, which he admits afforded him sufficient light to see the small iron hand-hold on the end of the tender, which he got hold of or attempted to get hold of; yet he tries, as it would seem, to leave the impression that the lantern did not afford

him sufficient light to see the five-gallon oil can on the step, and accepting this as true it but adds to the strength of the proof his evidence affords of his own gross negligence proximately causing the injuries for which he sues, or at least contributing thereto.

It is also shown in the evidence that while the engine is moving to and fro at work on the yard at night colored lights are set back on the tender so that the edge of the tender throws a shadow down immediately around the tender and no light is thrown on the step or foot-board. These lights are only put on the engine as "markers," i. e. for the purpose of indicating to people and trainmen the location of the engine, and not for the purpose of enabling them to get upon the engine. Their absence from the engine on the night of this accident, even if under the circumstances they should have been there, could not by any possibility have contributed to the accident, since the plaintiff himself testifies that he both heard and saw the engine coming towards him. It also clearly appears, there being really no evidence to the contrary, that with the air valve shut off, which was the case, the engine could have been stopped without the air brakes as quickly and within the same distance by reversing and giving the engine steam.

A number of witnesses were permitted to give opinions in answer to hypothetical questions which assumed facts concerning the speed of the engine at the time the plaintiff was injured, and within what distance it could have been stopped after Taylor had notice of the plaintiff's peril, when these facts had not been and never were proved in the case; but we deem it unnecessary to comment on this evidence further than to say, that it was, under the circumstances, irrelevant and incompetent. The speed at which a train was moving or within what distance it could be stopped, are questions of actual fact and expert testimony thereon can, under no circumstances, be

introduced unless based upon the operation of cars or engines of similar construction and equipment, and under like conditions. *Richmond Pass., &c., Co.* v. *Rack's admr.,* 101 Va. 487, 44 S. E. 709.

The remaining question in the case is, whether or not Taylor, after he knew or had notice of plaintiff's peril, exercised ordinary care to prevent the injuries to him?

We do not attach any importance to the question, whether the plaintiff was upon the track of the defendant company on the night of his accident as an employee, or a stranger, or a trespasser. Conceding that it was his duty, as is so earnestly contended, to deliver the key to Taylor when he found it in his pocket several hours after he should have so delivered it, and that he was properly on the yard of the defendant company for that purpose as an employee, the question remains whether there was reasonable and proper cause for him to step in the middle of the track to await the approach of the engine to him, and then attempt to mount the step across the front of the tender from the middle of the track without sufficient light to enable him safely to do so, as he insists.

It was neither reasonably necessary or proper for him to take this risk in the performance of the duty resting upon him to deliver the key to Taylor. Thomp. on L. of Neg., secs. 3748, 3749, 4988; *Bertha Zinc Wks.* v. *Martin,* 93 Va. 791, 22 S. E. 869. He admits that if he had safely gotten upon the step he could not have delivered the key from there to Taylor, who was in the cab of the engine, but would have had to ride on the step down to where the engine was to stop at the coach, a distance less than 200 feet, before he could accomplish his purpose. Obviously he could have avoided the hazardous and dangerous undertaking to board this engine, as he did, by walking down to where the engine was to stop, as he knew, and it is conceded that he might have gotten upon the step of the tender from the side of the track or could have stood outside of the track, clear of all danger, and handed the key to Taylor as he

passed. His only excuse for not pursuing one or the other of these obviously safe courses is, that there was a ditch on each side of the track in which there was some water, yet on cross-examination, when pressed to answer whether in crossing this ditch to get in the middle of the track he did not get mud on his feet which caused him to slip and fall when he attempted to board the engine, he stated "No," that he "stepped" over the ditch.

No principle of law is better established than that "where an employee is confronted with two methods of performing work, the one safe and the other dangerous, he owes a positive duty to his employer to pursue the safe method, irrespective of the degree of danger which may be involved in the unsafe method, and any departure from the path of safety will prevent his recovery if he is injured." *Street's admr.* v. *N. & W. R. Co.,* 101 Va. 746, 45 S. E. 284, and authorities cited; *Newport News, &c., Co.* v. *Beaumeister,* 102 Va. 678, 47 S. E. 821.

Accepting his statement as true, notwithstanding the strong proof to the contrary, that he was sober when he attempted to board the engine as he did, the fact of the plaintiff's gross negligence so clearly appears that his case is put beyond the possibility that reasonably fair-minded men might differ as to whether or not his negligence contributed directly to his own injury.

This being the situation at the beginning of the occurrences when plaintiff attempted to board the engine and fell under it, the law is equally well settled as to the liability or non-liability of the defendant company for the injuries he sustained.

"One who is injured by the mere negligence of another cannot recover any compensation for his injury if he, by his own ordinary negligence or wilful wrong contributed to produce the injury of which he complains, so that but for his concurring and co-operating fault the injury would not have happened, except where the direct cause of the injury is the omission of the

other party, after becoming aware of the injured party's negligence, to use a proper degree of care to void the consequences of such negligence." *Dun* v. *S. & R. R. Co.,* 78 Va. 545, 49 Am. Rep. 388.

The opinion in that case, by Lacy, J., says: "That a person who, by his own default, has brought upon himself a loss or an injury, can claim no loss or compensation for it from another, is a principle of universal application; and it is equally true that if his imprudence or negligence has so materially contributed to the loss or the injury that but for such imprudence or negligence it would not have occurred, he can claim no recompense from another who has been instrumental in causing it, unless the latter, upon the discovery of the danger into which the party had brought himself by his own fault, could, by the use of such diligence as the extent of the danger and the nature of the threatened injury required, have avoided the concurrence. Hutchinson on Carriers, pp. 502, 505."

This principle of law is clearly discussed and many of the authorities bearing upon it reviewed in the opinion by Buchanan, J., in the late case of *Richmond Pass., &c., Co.* v. *Gordon,* 102 Va. 498, 46 S. E. 772.

The principle was applied in *Dun* v. *S. & R. Rd. Co., supra,* where the suit was by a passenger suing for an injury sustained while rightfully on board of one of the defendant's passenger trains and to whom the defendant owed the highest degree of care, and what was said in the opinion and by the text-writer cited applies with greater force to a case such as we have under consideration, since, although conceding that the plaintiff was in the line of his duty when he went to deliver the key to Taylor, the night watchman, the well established principle, that in entering the employ of the master he assumed the risks ordinarily incident to the duties to be performed, also applies, and also the further principle that it is as much the duty of the servant to provide for his own safety from such dangers as are

known to him, or are discernable by ordinary care on his part, as it is the master's duty to provide for him (*Russell Creek C. Co.* v. *Wells,* 96 Va. 416, 31 S. E. 614), and that where an employee is confronted with two methods of performing work, the one safe and the other dangerous, he owes a positive duty to his employer to pursue the safe method irrespective of the degree of danger which may be involved in the unsafe method, etc.    *Street's admr.* v. *N. & W. R. Co., supra; Bowers* v. *Bristol Gas & Elec. Co.,* 100 Va. 533, 42 S. E. 296, and authorities cited.

"The extent of a person's duties is to be determined by a consideration of the circumstances in which he is placed. The law imposes duties upon men according to the circumstances in which they are called to act." It is true that "when the facts are disputed, the question of negligence is a mixed question of law and fact. The jury must ascertain the facts, and the judge must instruct them as to the rule of law which they are to apply to the facts as they may find them. Where, however, the direct fact in issue is ascertained by undisputed evidence, and such fact is decisive of the case, a question of law is raised, and the court should decide it. The jury has no duty to perform. The issue of negligence comes within the rule." *Dun* v. *S. & R. R. Co., supra.*

If we concede that the 10th instruction given for the plaintiff with the view of submitting to the jury the question, whether or not Taylor failed to perform his duty after the plaintiff fell under the engine, fairly and correctly propounded that question, although it failed to tell the jury that the defendant company was not liable unless Taylor failed to do his duty after he knew or had notice of plaintiff's peril, we are still of opinion that the verdict of the jury should have been set aside on the ground that it is without evidence to trace actionable negligence to the defendant company.

As to what transpired after the plaintiff fell under the engine and before the engine was stopped—which required but a mo-

ment of time—there is but little evidence. The engine, including its tender, was about 30 feet long and one of the plaintiff's witnesses, who evinced intelligence to form a correct opinion on that subject, testified that it could not have been stopped in less than a length and a half of itself, which would mean forty-five feet, and in any view of the plaintiff's evidence it did not run over 50 feet after the plaintiff fell, to run which distance, if going the speed claimed by the plaintiff—from 2-1/2 to three miles per hour—required but a few seconds. The engine was unquestionably stopped within the distance of forty-five feet, or about that distance. The plaintiff's statement is that he tried to get on the engine "right under the Larry Trestle," fell and commenced hollowing before he "hit the ground;" that he hollowed "a dozen times I expect," holding on to the step "for fifteen feet or more" and was "hollowing for him to stop all the time"; and he is corroborated as to "hollowing" by several witnesses, one of them about 150 yards away and another in the power house with several engines in motion, but quite naturally neither of these witnesses stated that Taylor heard or could have heard the "hollowing," as they did not know and could not have known the conditions surrounding Taylor. Taylor was in the cab, and the engine was "drifting" along, making "no noise" other than such as is usual when an engine is so moving. He says that he first heard the man "hollow" right under the trestle, right under his feet and about the time he heard his voice he felt the wheels hitting him and frankly admits that when he heard the man under the wheels of his engine he became "rattled and excited" and that it was a moment or two before he could think, but insists that he stopped the engine as soon as it was possible for him to have done so, and there is not the slightest evidence tending to prove that he was unduly excited, or to contradict the statement that he did all he could to stop the engine after hearing the man under it. To hold, according to plaintiff's view, that Taylor heard him "hollowing" to "stop the engine" and paid no heed

to his cries would be to impute to Taylor a criminal intent to inflict an injury to a man known to be in peril under his engine, when too Taylor was uniformed as to the position of the man, and could not know what was necessary to be done for his protection. Such an imputation could not be justified except upon the clearest and strongest proof, while here it finds no justification whatever, although we may accept as true the statement of the plaintiff's father that Taylor told him "that when he heard him hollow he thought of the oil can that was sitting on the foot-board, he said that was the first thing that came into his mind when he heard him hollow."

Ordinarily it is the party injured who invokes the doctrine sanctioned by this court in *Richmond Ry. & Elec. Co.* v. *Huddgins,* 100 Va. 409, 41 S. E. 736, that "one may not, by his own negligence or want of proper care, place another in a perilous situation, and when sued for injuries resulting therefrom put the burden on the plaintiff of showing that he acted with reasonable care. Persons in great peril are not required to exercise the presence of mind required of prudent men under ordinary circumstances"; but, as it seems to us, no good reason can be given why the converse of the proposition is not equally sound. Here the party doing the injury, *i. e.* the watchman, or acting engineer, Taylor, claims, and as we think properly, that having been suddenly put into an emergency by the negligence of the plaintiff, the latter could not require of him the wisest possible action. In other words, if the view of the plaintiff in this case be correct, A, by his gross negligence, may require action on the part of B to save him from the consequences of his own fault, and if B does not automatically and instantly do that which will conduce to his safety B is liable. Having no reason, whatever, to·expect that the plaintiff, or any one else, would on a dark night attempt to mount the engine in his charge from the middle of the track in front, or be on the track where the engine could inflict an injury upon him, Taylor was, by the negligence of the plaintiff, suddenly put into an

emergency when and where the wisest possible action on his part could not be reasonably required of him.    "It would violate every principle of justice or law if the defendant were compelled to foresee and provide against that which reasonable men would not expect to happen."    *Con. Brewing Co.* v. *Doyle,* 102 Va. 404, 46 S. E. 390.

It was a matter of pure speculation or conjecture as to what Taylor could or should have done after the plaintiff had, by his own gross negligence, gotten beneath the moving engine, since the evidence fails utterly to point out any negligence on Taylor's part intervening between the accident and the negligence of the plaintiff.

"The existence of negligence must not be left entirely to conjecture and courts cannot uphold the tentative conclusions of juries, based upon no sure grounds of inference."    *N. & W. R. Co.* v. *Cromer,* 101 Va. 671, 44 S. E. 898.

This is, therefore, clearly a case where the acts of the plaintiff and the conduct of Taylor were so substantially concurrent as to render it impossible to separate the conduct of the former from the injury itself, whereby plaintiff's right of recovery is precluded.    *Seaboard, &c. R. Co.* v. *Hickey,* 102 Va. 394, 46 S. E. 392; *Richmond Trac. Co.* v. *Martin,* 102 Va. 205, 45 S. E. 886, and other authorities cited above.

For these reasons, we are of opinion that the lower court erred in overruling the motion of the defendant company to set aside the verdict, and its judgment must be reversed and the case remanded for a new trial.

*Reversed.*