Syllabus.

# Richmond.

Norfolk and Western Railway Co. v. Sollenberger's Administrator.

November 18, 1909.

January 13, 1910.

Absent, Buchanan, J.

1. RAILROADS—*Negligence—Persons on Track—Trespasser—Infants—Misrepresentation as to Age.*—A railroad company is liable for an injury inflicted upon one on its track, even though he were a trespasser, if, after it discovered his peril, or had such notice thereof as would put a reasonably prudent man on the alert to discover the same and avert the injury, it failed to do all within its power, consistent with its other duties, to avoid inflicting an injury upon him. The fact that the plaintiff was an infant and obtained employment with defendant through misrepresentation as to his age would not relieve the defendant from liability for an injury inflicted under such circumstances.

2. RAILROADS—*Negligence—Employee Asleep on Track—Contributory Negligence.*—Although an employee of a railroad company may have been on duty for forty-eight consecutive hours, it is none the less contributory negligence on his part to fall asleep on a railroad track in daily use. His folly, or misfortune, however, would not excuse the railroad company in inflicting an injury upon him if it knew, or, by the exercise of reasonable care after it was put on notice, could have known, the peril in which he stood. In the case at bar the evidence does not establish negligence on the part of the railway company.

3. EVIDENCE—*Experiments—Negligence.*—It is impossible by tests subsequent to an accident, however faithfully they may be executed, to reproduce conditions as they actually existed. The mental attitude of the actors who know the positions of parties and what is to be expected is wholly different, and the case at last must be determined upon the evidence of the witnesses who were present upon the occasion of the accident, and who testify as to what they saw and heard of the actual occurrence.

4. RAILROADS—*Negligence—Sudden Emergency.*—An engineer of a rapidly moving engine who shuts off steam and applies his air brakes immediately when confronted with a sudden emergency, cannot be said to be guilty of negligence because he did not also use sand to stop his train. He has to deal with small fractions of time, and cannot act with deliberation.

5. VERDICTS—*Evidence—Inferences From Opinion of Witness—Case at Bar.*—The jury, in the case at bar, would not have been warranted in exonerating the plaintiff's intestate from the consequences of his gross contributory negligence by reason of the inferences drawn from the opinion of a witness who appears to have been in error as to the most essential condition upon which that opinion was predicated.

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Ayers & Fulton* and *Theodore W. Reath,* for the plaintiff in error.

*Bullitt & Chalkley* and *Paul Petit,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

This is an action brought by Sollenberger's administrator to recover damages for the death of his intestate, alleged to have been caused by the negligence of the railway company. A verdict and judgment was rendered against the company, which is now before us upon a writ of error.

Sixteen grounds of error are assigned in the petition, the first of which is to a judgment overruling the demurrer to the declaration and each count thereof.

This assignment is not well taken. The declaration originally consisted of three counts. The demurrer to the first count was sustained and it passed out of the case.

The second count states that the plaintiff's intestate was in the employ of the railway company as a flagman, and having been constantly employed for forty-eight hours consecutively, he became exhausted, was unable to keep awake, and fell asleep upon the main track of the defendant company some distance in the rear of the defendant company's wrecking train, and that thereupon the defendant company wrongfully and negligently backed its train of cars, without any watch or lookout, and without any warning to plaintiff's intestate of the approach of the engine, although the defendant discovered, or could by the use of ordinary care and diligence have discovered, the plaintiff's intestate upon the track and his perilous position, with its train moving backwards, inflicted mortal injuries from which he thereafter died. The third count is, in this respect, substantially identical with the second.

Now, although the plaintiff's intestate may have been an infant, who, without the consent of his parents, sought employment as a brakeman with the railroad company, and by misrepresentation as to his age induced the company to give him employment, if indeed he had been a mere trespasser, yet, if the allegations of the declaration be true, his administrator was entitled to recover.

All of the assignments of error, beginning with the second and running down to and including the eleventh, are without merit, and are not of sufficient interest to warrant a more particular discussion.

The twelfth assignment of error is to the action of the court in giving to the jury two instructions asked for by the plaintiff in the court below, which are as follows:

1. "The court instructs the jury that even though they may believe from the evidence that the plaintiff's decedent, Daniel I. Sollenberger, was guilty of negligence in lying on the railroad track and going to sleep thereon (if he was asleep), yet it became and was the duty of the defendant company, if it discovered his peril, or had such notice as would put a reasonably

prudent man on the alert to discover his peril, and guard against injuring him, to then do all it could reasonably under the circumstances to prevent the accident.

2. "They are, therefore, further instructed, that if they believe from the evidence that any of the employees of the defendant company in charge of the defendant's train saw said Sollenberger on the track in front of said train, and discovered his peril, or had such notice as would put a reasonably prudent man on the alert to discover the same and guard against injury, and that any such employee failed thereafter to exercise reasonable diligence to prevent said injury, and that, but for such failure of such employee, the accident would not have happened, then they should find for the plaintiff."

These instructions embody the same principle of law stated in the second and third counts of the declaration, which we have already approved; so that this assignment of error is overruled.

The first instruction asked for by the plaintiff in error is that if the jury believe from the evidence "that the plaintiff's intestate, in order to enter the service of the defendant company, falsely represented that he was over twenty-one years of age, when he knew, or had good reason to know, that such statement was not true, and that the rules of the defendant forbade the employment of minors in its operating department, they must find a verdict for the defendant, unless the jury shall believe from the evidence that the injury complained of was reck lessly, wantonly and wilfully inflicted upon him."

There was no error in the refusal of this instruction, under the facts of this case. As we have said, in treating of the demurrer to the declaration, if the injured man had been a mere trespasser, it was the duty of the railway company, after it discovered his position of peril, to do all within its power consistent with its other duties to prevent inflicting an injury upon him.

The second instruction asked for by plaintiff in error is as follows: "The court instructs the jury that even should they

believe from the evidence that the injury to the deceased should, in the exercise of ordinary care, have been prevented after his peril was discovered by any member of the train crew in question, they should nevertheless find for the defendant if they further believe from the evidence that deceased, in lying down upon the track at the time of the injury, assumed a position of danger that was neither necessary nor proper for him to have assumed under the circumstances as a member of said train crew and an employee of the defendant company."

This instruction plainly comes within what was said with respect to the preceding instruction, and was properly rejected.

After the refusal of the court to give these two instructions the railway company asked that the jury be instructed as follows: "The court instructs the jury that if they believe from the evidence that plaintiff's intestate, D. I. Sollenberger, went to sleep upon defendant's railroad track at a place where defendant's trains ordinarily passed, and where the wreck train in question was expected to pass, and that such action of Sollenberger was one of the contributing causes of his injury, even though they may believe from the evidence that said Sollenberger had been without sleep for a considerable length of time, such action of Sollenberger constituted contributory negligence on his part, and that the jury cannot consider any negligence, if any such there was, on the part of the defendant company or its employees, that happened prior to the said negligent act of plaintiff's intestate, Sollenberger. In other words, if the belief of the jury is as above set forth, the only negligence for which they can hold the defendant liable is the negligence, if any, of the defendant subsequent to the time it discovered the perilous position of the said Sollenberger, if it did so discover the same."

The court, however, refused to give the instruction as asked for by the defendant, but modified and gave it, the modification consisting of adding to the instruction, as asked for, the words, "or had such notice, if it did have the same, as would put a reasonably prudent man on the alert to discover his peril and guard against injuring him."

We are of opinion that the addition was proper, and that the instruction, as given, is a correct statement of the law.

This brings us to a consideration of the motion to set aside the verdict as contrary to the evidence.

Upon the occasion of the accident Sollenberger was in the employment of the Norfolk and Western Railway Company as a brakeman upon a wrecking train, which had been sent out to remove a wreck upon the line of its road near St. Paul's station. According to the testimony of Ludey, a witness for the defendant in error, who was wrecking foreman of the train in question, it consisted of a derrick car, a flat car, a tool car, and an engine, beginning at the west end. Then there were a flat car, a cook car, a dining car and a refrigerator car; the refrigerator car being on the extreme east end of the train, the derrick on the extreme west end, and the engine about in the middle. The engine was headed west, and was backing towards the east.

Sollenberger, the brakeman, had been sent down the line towards the east to flag an expected passenger train, and at the time of or immediately preceding the accident the wrecking train, with its engine headed west, was moving backward towards the east at a speed estimated at from eight to fifteen miles an hour. There was a curve in the track, which is described as being "a curve," "not so much of a curve," and "quite a bit of a curve." Ludey was on the tool car, a car built especially for the purpose of carrying tools. It was on the order of a box car, had a platform at each end, and was used for loading, blocking and other purposes. The witness was on the inner side of the curve, and could see past the other cars in the train to the point where Sollenberger was lying upon the track. He says: "When I first saw him I looked for a second or so; I could not see what it was at first. The thought struck me that it was a man there, and I went across to the other side of the tool car to see the engineer, and hollered at him and waved him down to stop. Then I went back again, and hollered at the man ahead on the track. When I come back I could see plain it was a

man on the track.    The train did not slack up, and I come back on that side again and hollered at him to stop, and waved him down all I could, and he did then stop; I went back again, and we were right close to him then.    I saw him when he was struck by the car.

"Q. Approximately, how long did it take you, after you first saw the man on the track, to go across to the engineer's side and give him the signal to stop?    A. It did not take any longer than to take about two steps anywhere.    I was on the level floor.

"Q. Did or not the engineer see your signal this time?    A. I don't think he did.

"Q. From your knowledge of railroads and trains, if he had obeyed your first signal, could he or not have stopped the train in time to have kept from running over the man on the track? A. Yes, he could have done that if he had stopped as soon as I gave him the first signal."

Thos. Peak, a witness for the railway company, testified:

"Q. What was the first you noticed in regard to Ludey's seeing the body on the track—seeing Sollenberger on the track? A. Hollering; he hollered.

"Q. What did you do when he hollered?    A. I looked back west when he first hollered.

"Q. You did?    A. Yes, sir; then looked east and seen the boy.

"Q. How far was the front end of the train, or rear end of the train, or rear end of the train as you were backing up, how far was the refrigerator car, the east end of the train, from Sollenberger?"    (It will be remembered that the refrigerator car was on the extreme east end of the train.)    A. "When I seen it?

"Q. Yes.    A. About a car length and a half when I seen him.

"Q. You say you looked west first?    A. Yes, sir.

"Q. When Ludey first hollered?    A. Yes, sir.

"Q. How long after that before you looked east?    A. Just as soon as I could turn my head the other way.

"Q. What did you look west for? A. We was getting out of the way of 86, and I thought it was running into us, that was the reason I looked west.

"Q. How did Ludey holler? A. Why, he hollered pretty loud.

"Q. Well, how? A. He hollered 'Hey' pretty loud; that is just the way Ludey did, he could holler pretty loud, or stout voice.

"Q. How soon after he hollered was the air brake applied, or was it applied? A. Yes, sir; I could not say whether it was or not; didn't take much notice of it.

"Q. How soon after he hollered was the train stopped? A. It stopped in about half a minute or something like that, as near as I could guess at it.

"Q. Which way was the engineer facing before Ludey hollered? A. He was looking east before, just before he hollered."

William Trigg, a witness for plaintiff in the court below, was asked:

"Q. Were you on the wreck car at the time Dan Sollenberger got hurt? A. Yes, sir.

"Q. Where were you at the time of the accident, on that car? A. Between the dining car and the cook car.

"Q. Whereabouts between those cars were you standing? A. On that platform on the east end of the car.

"Q. In the middle of the platform? A. Standing on the edge.

"Q. Which edge? A. South side.

"Q. Just tell the jury what was the first you knew of the trouble? A. The first I knew of the trouble I hear someone holler, and I looked east and saw the man lying on the track, and I was about a car length from him; then I crossed over to the north side of the car and waved the engineer down.

"Q. Did he do anything to stop until you waved him down? A. I could not tell."

The engineer, Hall, says, testifying for the railway company, that at the time of the accident his engine was headed west and was moving east; that he was on the right-hand side of his engine, and looking in the direction in which he was moving. In answer to the question, "State what occurred and what was the first intimation you had?" (of the trouble), he says: "I was backing up, and I heard a scream, or hollering, and the engine was working steam. I shut it off and asked my fireman if he heard anybody give a signal. I didn't hear anybody, and somebody waved me down on the wreck car, or cab, and I throwed the brake in emergency, and stopped as quick as I could, and the boy was hurt when I stopped.

"Q. Did you see any signal from anyone on the derrick car west of you? A. No, sir.

"Q. Did you see any signal on any car west of you? A. No, sir.

"Q. State whether or not you applied your air in emergency as soon as you saw a signal to stop? A. Yes, sir; I did.

"Q. After the train had stopped, did you discover that this boy had been injured? A. Yes, sir."

Upon cross-examination, in answer to questions, he said:

"Q. You heard somebody holler, did you? A. Yes, sir.

"Q. And you shut off the steam? A. Yes, sir.

"Q. You could hear them holler? A. I could not hear what they said; I just heard a fuss.

"Q. You asked the fireman if he saw any signal? A. Yes, sir.

"Q. What was the fireman doing at the time? A. I don't remember.

"Q. Was he shoveling coal? A. Maybe he was; I could not say.

"Q. What made you stop the train? A. I saw a man wave me down out of the cab of the wreck car?

"Q. Out of the cab of the wreck car? A. Window of the wreck train.

"Q. What was the first signal you heard, hollering to stop? A. I don't know; didn't know how it was.

"Q. Where did it come from? A. I don't know; I just heard the sound of a voice.

"Q. Hollering for you to stop? A. No, sir; I could not hear what he said, just could hear a yell.

"Q. You paid enough attention to shut off the steam, did you? A. Yes, sir.

"Q. How long after that was it that you saw this signal? A. Well, very few seconds; I could not say how long it was.

"Q. Did you apply any sand? A. No.

"Q. You had sand on the engine? A. Yes, sir; but I was backing up.

"Q. I say you had sand on the engine? A. Yes, sir.

"Q. Did you reverse your engine? A. No, sir.

"Q. Give the engine steam? A. No, sir.

"Q. You just applied the air? A. Yes, sir."

The witness further testified that it was a very usual thing for people to scream and "holler" at the train hands as they passed along the road, and that railroad business could not be conducted if the trains were stopped or halted upon every such occasion.

Some time after the accident a test train was made up to correspond with the wrecking train used at the time Sollenberger was killed. Counsel for plaintiff and defendant were present and numerous tests were made, and no doubt with the utmost fairness and integrity of purpose. But after all it is impossible to reproduce conditions as they actually existed. If it were possible to reproduce all of the physical conditions, as may be done in theory, but not in practice, the mental attitude of those engaged in the tests is necessarily wholly different. Every man engaged in the test knew from the beginning that in the actual occurrence there was a man upon the track exposed to imminent danger. The positions of the actors at a particular moment of time could not be determined with pre-

cision; and upon the whole it seems to us that the case must, after all, be determined upon the evidence adduced before the jury by witnesses who were present upon the occasion of the accident, and who testified to what they saw and heard of the actual occurrence.    It is oftentimes instructive to take a jury to the scene of an accident, in order to enable them more intelligently to appreciate the evidence adduced before them; but that is altogther different from what was done in this case.

That it was negligence upon the part of young Sollenberger to go to sleep upon the track, does not admit of question.    If in truth he had been employed for forty-eight hours without sleep and without rest, it is difficult to conceive of an emergency which would justify the railway company in imposing so cruel a task upon one of its employees; but it was none the less contributory negligence on his part to fall asleep in a position of peril so constant and so imminent as upon a railroad track. His folly, or his misfortune, however, would not justify or excuse the railway company in inflicting the injury upon him, if it knew, or had such notice as would put a reasonably prudent man upon the alert to discover Sollenberger's peril and to guard against any injury to him.

If the verdict and judgment of the circuit court be sustained, it must rest upon the testimony of Ludey, the substance of which we have given in his own words.    When he first saw the object upon the track, he was uncertain and looked at it for a second or two, and then the thought struck him that it was a man, and he crossed to the opposite side of the tool car on which he was and "hollered" to the engineer and waved him down; but he says, in answer to a question, "I don't think that the engineer saw that signal," and that, of course, deprives his opinion that the train could have been stopped in time if the first signal had been obeyed of all force and virtue.    It will be remembered that he cried out—that he "hollered"—but that in itself is not a signal.    It is not necessarily to be inferred from a

man's crying out, where a number of men are engaged, that any one is in danger. The engineer says that when he heard Ludey "holler" he shut off the steam by way of precaution; that he did not stop his train because he had received no signal to stop, or any signal the natural tendency of which was to inform him that it was necessary to stop; that as soon as he did receive a signal to stop, when his train was waved down, as the expression is, he threw down the emergency brake and halted the train as soon as possible. Another witness, whose testimony we have quoted on behalf of the plaintiff in the court below, says that when he heard the scream, or in other words heard Ludey "holler," he looked and saw a man lying on the track, and that he was then about a car length and a half from him.

It is said that the engineer was derelict in not using sand. But it is to be remembered that we are dealing with small fractions of time; that we are dealing with an emergency suddenly thrust upon the engineer, and in which he was called upon to act with the utmost promptness; that the engine was moving at the rate of from eight to fifteen miles an hour; and that the train was close upon Sollenberger when Ludey gave the alarm; that in that time the engineer shut off the steam as a precautionary measure; and that as soon as he was waved down, which was the first signal given to stop, he applied the air brakes, and the accident occurred immediately thereafter. *Wise Terminal Co.* v. *McCormick,* 104 Va. 400, 51 S. E. 731.

Upon the whole case we are of opinion that the evidence does not show that the railway company or its employees failed to exercise reasonable diligence to prevent the injury complained of after it discovered Sollenberger's peril, or had such notice as would put a reasonably prudent man upon the alert to discover the same and to guard against the injury.

The judgment of the circuit court must be reversed, and the cause remanded for a new trial.

Upon Petition to Rehear.

Keith, P.:

The defendant in error has filed a petition to rehear the judgment rendered on November 18, 1909 (66 S. E. 726), and in support of the petition shows that there was an error in the transcript of the record upon which the case was heard and decided.

A very important witness for the defendant in error, plaintiff in the court below, was one S. J. Ludey, who, in narrating what occurred when he first saw Sollenberger upon the track, stated in part as follows:

"Q. What did you think and what did you do when you first saw him on the track? A. Well, when I first saw him I looked for a second or two; I could not see what it was at first. The thought struck me that it was a man there, and I went across to the other side of the tool car to see the engineer, and hollered at him and waved him down to stop. Then I went back again, and hollered at the man ahead on the track. When I come back I could see plain it was a man on the track. The train did not slack up, and I come back on that side again and hollered at him to stop, and waved him down all I could, and he did then stop. I went back again, and we were right close to him then. I saw him when he was struck by the car.

"Q. Approximately, how long did it take you, after you first saw the man on the track, to go across to the engineer's side and give him the signal to stop? A. It did not take any longer than to take about two steps anywhere. I was on the level floor.

"Q. Did or not the engineer see your signal this time? A. I don't think he did.

"Q. From your knowledge of railroads and trains, if he had obeyed your first signal, could he or not have stopped the train in time to have kept from running over the man on the track? A. Yes, he could have done that if he had stopped as soon as I gave him the first signal.

"Q. I believe you said he did obey your second signal? A. Yes.

"Q. How far did the front part of your train pass over and beyond Sollenberger? A. It was something like about fifty-five feet I suppose."

It is agreed between counsel that the above questions and answers are not complete, and (without undertaking to repeat the whole) that they should have read as follows: After the question "Did or not the engineer see your signal this time?" the answer should be "Yes"; then should follow the question, "Did he make any effort to stop or not?" A. "I don't think he did." In other words, the answer "Yes" to the question which precedes it, and the question which succeeds it, "Did he make any effort to stop or not?" were by some accident omitted from the record.

The pith of Ludey's testimony is found in two expressions of opinion. "Did he (the engineer) make any effort to stop or not? A. I don't think he did." "Q. From your knowledge of railroads and trains, if he had obeyed your first signal, could he or not have stopped the train in time to have kept from running over the man on the track? A. Yes, he could have done that if he had stopped as soon as I gave him the first signal."

It will be observed that Ludey does not state as a fact that the engineer did not make an effort to stop upon receiving the first signal. He says "I don't think he did," while the testimony of the engineer, who is corroborated by other witnesses, is that he was in his proper place on the right-hand side of the engine; that he was looking in the direction in which he was moving, which was toward the east; and in answer to the question "State what occurred, and what was the first intimation you had" of what occurred, he says: "I was backing up and I heard a scream or hollering, and the engine was working steam. I shut it off and asked my fireman if he heard anybody give a signal. I didn't hear anybody, and somebody waved me down on the wreck car, or cab, and I threw the brake in emer-

gency, and stopped as quick as I could, and the boy was hurt when I stopped."

"Q. Did you see any signal from anyone on the derrick car west of you? A. No, sir.

"Q. Did you see any signal on any car west of you? A. No, sir.

"Q. State whether or not you applied your air in emergency as soon as you saw a signal to stop? A. Yes, sir; I did."

But let it be conceded that the engineer saw the signal, and that his receipt of the signal was not followed by any effort to stop. Let us examine the value of Ludey's opinion that the train could have been stopped in time to avoid the injury.

That opinion was, of course, conditioned upon the grade, the length and weight of the train, its speed, and the distance between the east end of the train and young Sollenberger when the signal was given. Of these conditions the speed of the train is not definitely ascertained, and the most important of them all was the intervening distance. That had been fixed by Ludey at 150 yards or 450 feet, and his opinion is to be taken as having been based upon that estimate. Before the trial was concluded the jury were taken to the scene of the accident, and all the conditions were reproduced as far as that could be done, with the result that it was admitted in the presence of the jury that Ludey was mistaken in his estimate of the distance between the east end of the train and Sollenberger when he first saw him on the track. It is probable that Ludey made his estimate of the distance, not from the east end of the train but from the point where he stood on a car which was to the west of the engine, which, it will be remembered, was in the center of the train. So that, from the estimate of the intervening distance as given by him there must be deducted the length of the train between the point where he stood and its eastern end. This would be about 246 feet, which deducted from 450 feet leaves 204 feet; or if taken from the 486 feet, which is the distance of what is known as "Bullitt's signal point" in the record, will leave 240 feet.

It would require a liberal interpretation of the power, or, more properly speaking, the right of a jury to deduce inferences from testimony to hold that Ludey's statement when he was asked "Did the engineer make any effort to stop or not?" that "I don't think he did" would have warranted a verdict exonerating the defendant in error's intestate from the consequences of the gross contributory negligence established beyond question in this case, and the whole probative value of the opinion falls to the ground when it is made to appear that the witness was in error as to the most essential condition upon which that opinion was predicated.

All other questions presented in the petition have been already considered in the opinion heretofore filed, and the petition to rehear is denied.

Rehearing denied.

*Reversed.*