# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## JAMES C. DAVIS, DIRECTOR GENERAL OF RAILROADS, V. CURTIS POWELL.

### December 18, 1924.

1. APPEAL AND ERROR—*Conflicting Evidence.*—Where the jury found a verdict for the plaintiff, the evidence adduced in his behalf, when it conflicts with that of defendant, for the purposes of appeal, is accepted as true.

2. MASTER AND SERVANT—*Assumption of Risk—Section Man Riding on Railway Motor Truck to and from Work.*—Plaintiff, a section man, was injured by a fall from a railway motor truck while going to work. The use of the motor car for transporting the section men was the accustomed manner and means of going to and coming from the work known to the plaintiff, and participated in by him for weeks, without objection or complaint. He was acquainted with the track and its curves. The work of repairs and reaching the points where repairs were to be made must necessarily be accomplished between the running of trains and this was known to the plaintiff. So that, as to all these things, involving dangers to a certain degree though they did, there is no act of negligence shown to aggravate the danger; they were dangers incident to the employment, and the plaintiff assumed the risk as to them.

3. MASTER AND SERVANT—*Assumption of Risk—Section Man Riding to Work—Sudden Stop—Case at Bar.*—A section man riding to and from his work on a railway motor car assumes the risk of meeting trains and sudden stopping to avoid collision.

4. MASTER AND SERVANT—*Section Men—Assumption of Risk—Collision with Trains.*—Ordinarily, section men or track men assume the risk incident to running of trains, whether extra trains or trains running on schedule time. Such employees are bound to know that regular trains may be delayed and pass at uncertain intervals, and that wild trains may be sent out over the road, and they assume the risk of danger therefrom.

5. MASTER AND SERVANT—*Section Man—Meeting Trains—Jerk from Sudden Stop.*—While a section man assumes the risk of an ordinary jerk resulting from sudden stopping to avoid a collision while riding to and from his work in a railway motor car, he does not assume the risk of danger arising from extraordinary jerks occasioned by the operation

of the motor truck, unless the negligence and the danger arising therefrom were obvious.

6. Master and Servant—*Section Man—Meeting Trains—Jerk from Sudden Stop—Case at Bar.*—In the instant case plaintiff, a section man, was injured by a fall from a motor car, on which he was riding to work, occasioned as he alleged by a jerk when the car stopped suddenly to avoid a collision.

*Held:* That if the car was running at fifteen or twenty miles an hour there would be some danger attached to stopping suddenly even at that rate of speed, but the jerk so occasioned would be an ordinary one, the danger from which the plaintiff assumed as well as the risk of meeting trains en route to his work, and all other ordinary dangers incident to his employment.

7. Master and Servant—*Section Man—Meeting Train—Jerks from Sudden Stop—"Error in Extremis."*—Plaintiff, a section man, was injured by a fall from a railway motor truck upon which he was riding to work, occasioned as he alleged by the sudden stopping of the car by the foreman, who was driving, to avoid a collision. As between the danger from a sudden stopping and the danger of collision the foreman was confronted by a sudden emergency, brought about through no fault of his, and even if his judgment was erroneous this was not negligence.

8. Master and Servant—*Section Man—Meeting Trains—Jerk from Sudden Stop—Speed of Train—Evidence.*—Plaintiff was injured by a fall from a railway motor car upon which he was riding to work, occasioned as he alleged by the sudden stopping of the car to avoid a collision. Plaintiff testified that the motor car was running at thirty or thirty-five miles an hour. While this was a mere estimate, he also testified that the foreman was running "awfully rapid" to keep out of the way of a passenger train.

*Held:* That the fact that the plaintiff could not definitely fix the speed of the car went to the weight of his testimony and not to its admissibility.

9. Master and Servant—*Section Man—Meeting Trains—Jerk from Sudden Stop—Running at Excessive Speed—Extraordinary Jerk.*—Plaintiff, a section man, was injured by a fall from a railway motor car, occasioned as he alleged, by the sudden stopping of the car to avoid a collision.

*Held:* That if the foreman was running the car at a rate of speed in excess of the maximum permitted by the rules of the company, and to avoid an imminent collision suddenly applied his brakes, thereby causing an extraordinary and unusual jerk, and by reason of this the plaintiff was thrown forward upon the track, run over and injured; then the defendant was guilty of negligence, which was the proximate cause of plaintiff's injury, for which the defendant is responsible in damages, unless the plaintiff by his conduct assumed the extraordinary risk.

10. MASTER AND SERVANT—*Assumption of Risk—Statement of Rule—Federal Employers' Liability Act.*—The rule of assumption of the risk is that an employee assumes all the ordinary risks incident to the employ-\ment. He also assumes such extraordinary risks as are plain and obvious. He does not assume risks arising from the master's negligence, or from the negligence of fellow servants (under the Federal employer's liability act), unless they are obvious, or he knows of them and appreciates them, and continues in the service.

11. MASTER AND SERVANT—*Assumption of Risk—Obvious or Known Danger.*—At common law the rule is well settled that the servant assumes extraordinary risks incident to his employment or risks caused by the master's negligence, which are obvious or fully known and appreciated by him.

12. MASTER AND SERVANT—*Assumption of Risk—Questions of Law and Fact.*—The question of the assumption of the risk is usually one for the jury, but it is otherwise, if the evidence discloses facts upon which reasonable minds are not likely to differ.

13. MASTER AND SERVANT—*Fellow Servant—Assumption of Risk—Federal Employers' Liability Act.*—The fellow servants doctrine has been abolished under the Federal employers' act; but the doctrine of assumption of risks is still applicable to the Federal act in its original and undiminished force, save in one instance.

14. MASTER AND SERVANT—*Assumption of Risk—Extraordinary Risk Known to Servant—Section Man Riding on Motor Car Driven at Excessive Speed—Case at Bar.*—In the instant case plaintiff, a section man, was injured by a fall from a railway motor car, occasioned as he alleged by the sudden stopping of the car, which was being driven by the section foreman at an excessive rate of speed to avoid a collision with an approaching train. According to plaintiff's own statement he was fully conscious of the excessive rate of speed at which the foreman was driving and his reason for so driving, but there was no evidence of any protest on his part. On the contrary, he participated in all that was done, had ample time to appreciate what was an obvious departure from the rules and customs, and the dangers arising therefrom.

*Held:* That the plaintiff assumed the extraordinary risk of the foreman's negligence, and that this assumption of the risk is a bar to his recovery.

## UPON A PETITION TO REHEAR.

May 28, 1925.

15. MASTER AND SERVANT—*Section Man—Riding on Motor Trucks to Work—Assumption of Risk—Knowledge of Peril.*—A section man who had been riding to his work for four months on a motor truck driven by

his foreman assumes the risk of meeting trains on the track and the risk from the excessive speed of the truck against which he did not protest. Where, as in this case, the sole act of negligence relied on is participated in and voluntarily consented to by the person injured, with full knowledge of the peril, the question of the master's liability does not arise.

16. MASTER AND SERVANT—*Violation of Rules—Failure to Allege—Waiver.*— In an action by a section man for injuries sustained while riding to his work on a motor truck, stress was laid in a petition to rehear upon the violation of the rules of the company by the foreman in going upon the track ahead of a passenger train, and in the face of an approaching freight train, without finding out the location of the trains. No violation of the rules was charged in the pleadings nor established by the evidence and the question was not submitted to the jury by an instruction as to the alleged negligence.

*Held:* That the question of the violation of rules was waived.

17. NEGLIGENCE—*Pleading—Instructions.*—The jury cannot be turned loose to find a defendant guilty of any negligence which might be based upon a breach of any duties charged in the declaration, when the court has given all the instructions asked for by the plaintiff setting out his theory of the case and no mention is made of such charges of negligence in the instruction.

18. APPEAL AND ERROR—*Sudden Emergencies—Point not Raised in Trial Court—Case at Bar.*—While, in the instant case, an action by a section man for injuries received while riding to his work on a motor truck, the question whether the foreman of defendant was absolved from negligence because he was forced under the circumstances to act in emergency, was not raised in the trial court, yet upon a motion to set aside a verdict as contrary to the law and the evidence, if it appears in the appellate court that the facts proven in the court below established a case, *as a matter of law*, where the defendant was without his fault forced to act in an emergency, and an accident occurred resulting in injury to another, the appellate court would set the verdict aside although no mention was made in the trial court of the doctrine of error in *extremis*.

19. NEGLIGENCE—*Sudden Emergencies—Question for Jury.*—It is true that as a rule the application of the doctrine of "error in *extremis*" is one for the jury when the evidence is conflicting.

Error to a judgment of the Circuit Court of Fluvanna county, in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. H. & Walter Leake*, for the plaintiff in error.

*Gordon & Gordon*, for the defendant in error.

CHICHESTER, J., delivered the opinion of the court.

The defendant in error, Curtis Powell, was plaintiff in the trial court, and will be hereinafter referred to as the plaintiff. The plaintiff in error was defendant in the trial court, and will be hereinafter referred to as the defendant.

The notice of motion was originally instituted against the Chesapeake and Ohio Railway Company for damages sustained by the plaintiff on February 2, 1918, because of alleged negligence on the part of the said company when it was under Federal control. Before trial of the case, James C. Davis, the then Director General of Railroads, as such, was made defendant to the notice of motion.

The Chesapeake and Ohio Railway Company is an interstate system, engaged in interstate commerce, and hence the Federal employers' liability act (U. S. Comp. St. sections 8657-8665) controls the case.

The plaintiff was employed by the defendant, for a period of more than four months prior to the injury of which he complains, as a section hand under a foreman, L. E. Minter, who had been in the employ of the Chesapeake and Ohio Railway Company for many years. The section of track which Minter and the hands under him had been engaged in repairing for some weeks lies between the stations of Palmyra and Troy, in Fluvanna county. The daily routine was to leave Palmyra (where Minter lived, and where the gasoline motor truck, upon

which the section hands rode to their work, was kept during the night) in the early morning about seven o'clock, just behind a passenger train which was due at Palmyra a few minutes before this hour. The point at which the trackmen were working was near Wildwood, about four miles from Troy and about three miles from Palmyra.

On the morning of the accident, the passenger train which foreman Minter usually followed out from Palmyra was late, and he went to the phone, as he expressed it, "for his orders." He ascertained that a freight train known as the "Bull Dog Special," running light, which had not then reached Troy, would meet the passenger train at Rockaway, a telegraph station about one and one-half miles west of Palmyra. Minter's testimony on this point is brief, uncontradicted in its essential features, and is as follows:

"Q. Was that train ever late?

"A. Yes, sir.

"Q. Well, when it is late what was your custom?

"A. Oh, I would go to work. I would get orders, and find out how much late it is, and if I have time to get to my work I go to work.

"Q. I believe you testified you phoned?

"A. Yes, sir; I do it every morning. I cannot afford to go out here and take a risk against these trains around these bluffs without doing it.

"Q. And you did it on that morning?

"A. Yes, sir; I keep the keys for that purpose.

"Q. Where did you phone?

"A. I phoned to a telegraph station. They knew exactly where the trains were.

"Q. What station?

"A. Troy.

"Q. And what did they tell you?

"A. They said it was late; and that it would meet this extra at Rockaway; and that the extra had not passed Troy at that time.   And I knew that I would have time to get to my work.

"Q. Where were you going?

"A. Just above Wildwood.

"Q. How far is that from Troy?

"A. Four miles.

"Q. How far is it from here?

"A. Three miles."

Having performed the duty of ascertaining as near as possible where the trains were, he took his force and set out upon his journey.

The evidence shows that the motor truck used to transport the hands to and from their work was of the usual type used for this purpose, and that it had been used practically every day during the plaintiff's employment for the purpose.   It showed that the railroad track over which it passed had numerous curves and that it ran in and out among the hills and bluffs, and that the way was, by nature, somewhat hazardous for employees who were compelled to go to their work as these employees were.

After the station called Rockaway, where the passenger and freight trains were scheduled to meet, had been passed and all danger from the passenger train overtaking the motor truck had ceased, the accident which resulted in the plaintiff's injury occurred.

Minter was operating the motor car, sitting on the left hand side at the rear.   The plaintiff was sitting on the right side of the car in front, and under Minter's direction keeping a lookout ahead for approaching trains. Tom Berkeley, another employee, who was deceased at the time of the trial, was sitting by plaintiff's side, while

Robert Payne and Robert Walker, the other employees, were sitting on the left side of the car with their backs to plaintiff's and Berkeley's. Minter testified that the maximum speed prescribed by the rules of the company at which the motor truck should be run was twenty miles per hour. Up to this point there is no material conflict in the testimony.

Minter, Payne and Walker all testify that as the car was passing through a cut and was rounding a curve which bore to the left and going at a speed not exceeding fifteen miles per hour, the plaintiff either fell or jumped from the motor car upon the track between the rails in front of it, and was run over and injured. They testified that after the motor car had been stopped a rail, or a rail and a half, length ahead, and plaintiff had been helped up and walked with some assistance to a crossing just ahead of where the accident happened, some five or six rail lengths, and after the motor car had been pushed forward to the crossing and removed to the side, the freight train passed by and did not stop, and that some time thereafter the passenger train passed.

They and others testify that the plaintiff stated to them immediately after the accident and before he was carried to the hospital, that he did not know "how it happened—the only way he could arrive at it, that he was not holding on, and that he just became over-balanced and fell off, that he did not attach any blame to anybody."

The plaintiff's testimony at the trial as to how the accident happened is in direct conflict with all the other eye witnesses. As far as it is pertinent to this discussion, he testified:

"Q. Now, will you tell the jury in your own words what happened after you got on the car, until the time that you were hurt, if you were hurt, and how you were hurt?

"A. Well, I got on the hand car that morning and started up the track towards Wildwood, and on my way there I met a train, and Mr. Minter was running awfully rapid, and I saw the train approaching, and I told him the train was coming; and as soon as I said the train was coming, he cut the engine off from working and applied the brake, and it just pitched me off forward; that jerk.

"Q. Well, when they pitched you off, what became of you then?

"A. I do not know what became of me then.

"Q. You do not know whether the car ran over you or not?

"A. No, sir; I got crippled, but I do not know what crippled me.

\*          \*          \*          \*          \*          \*          \*          \*

"Q. You say that you called Mr. Minter's attention to the train?

"A. Yes, sir.

"Q. What did you see?

"A. I saw the light first, and then I saw the train. I saw the smokestack.

\*          \*          \*          \*          \*          \*          \*          \*

"Q. Well, you say you first saw the headlight?

"A. I did not see the headlight. I saw the light flashing around the curve.

"Q. You saw the reflection of the light?

"A. Yes, sir.

"Q. Then just explain it to the jury?

"A. I saw the light flashing around the curve, and then I saw the smokestack.

\*          \*          \*          \*          \*          \*          \*          \*

"Q. Tell the jury how long was it after you told Mr. Minter that there was a train before this sudden stopping of the car took place?

"A. Just as soon as I finished talking; it took place all at once.

"Q. All at once?

"A. Yes, sir.

"Q. Now you say that you did not know anything when you struck the ground or struck the track?

"A. No, sir.

"Q. When did you first know anything?

"A. In the hospital.

"Q. Where?

"A. Richmond.

"Q. How long after the accident?

"A. I did not remember what day it was when I came to myself so that I knew where I was at.

"Q. Come as near to it as you can?

"A. I guess it was about two days."

The plaintiff further testified that he had ridden the motor car to and from his work for about four months.

Among other allegations of negligence which are charged as resulting in injury to the plaintiff are that the foreman, Minter, was negligent in going upon the tracks between two trains, one following and the other meeting the motor car; that it was negligence to use a gasoline motor car with its greater speed in the place of a hand car; that the foreman drove the car too rapidly around curves when the track ahead was not in plain view; that he drove at an excessive rate of speed and when warned that a freight train was approaching stopped suddenly and precipitated the plaintiff upon the track, ran over him and injured him.

Upon the issue joined, the jury found a verdict in the sum of $2,500.00 in favor of the plaintiff, upon which judgment was entered by the court.

There were a number of exceptions taken during the progress of the trial, and there are a number of grounds

of error assigned for the reversal of the judgment here. The only one which it is necessary to consider is the fifth, as set out in bill of exceptions No. 1:

"The court erred in overruling the motion to set aside the verdict because it was contrary to the law and evidence and without evidence to support it—and in declining to enter up judgment for the defendant for the same reason."

We think this assignment of error is well taken. Of course there can be no recovery in this case unless there was negligence on the part of the Chesapeake and Ohio Railway Company, its agents or employees. The first inquiry therefore is, was there any negligence on the part of Minter, the foreman, which was the proximate cause of the injury of which the plaintiff complains?

[1] The jury having found a verdict for the plaintiff, the evidence adduced in his behalf, when it conflicts with that of defendant, for the purposes of this discussion is accepted as true.

There are only four material points of conflict. The plaintiff's testimony upon these is:

1. That as the motor car upon which the section crew were riding to their place of work was rounding a curve, it was met by a freight train bearing down upon them in close proximity when it was discovered.

2. That upon being warned by the plaintiff, who was on the lookout, and who first saw the approaching train, Minter, the section foreman, suddenly applied the brakes and stopped the motor car.

3. That at the time the brakes were thus suddenly applied Minter was running the motor car at an excessive rate of speed, estimated at from thirty to thirty-five miles an hour; and

4. By reason of the sudden jerk occasioned by the application of the brakes while going at the unusual

rate of speed, plaintiff was thrown forward upon the railroad track between the rails and injured.

[2] Before discussing the question as to whether there is any negligence shown on the part of Minter resulting in injury to the plaintiff, accepting the foregoing as the true facts, it is pertinent to say that there is no negligence disclosed by the evidence as to which there is no conflict and no state of facts which could properly have been submitted to the jury for it to say whether there was negligence or not. In other words, as a matter of law, leaving out of consideration for the time being the foregoing points upon which there is a conflict, there is no negligence on the part of the defendant or its agents, disclosed by the evidence. Indeed, this seems to have been conceded by the plaintiff in the trial court, the plaintiff's entire case there having been presented to the jury by an instruction charging negligence in suddenly stopping the motor car, thereby precipitating him upon the track and running over him.

But aside from this apparent concession, while in the notice of motion for judgment, there were a number of charges of negligence as heretofore indicated and probably some evidence which might be said to bear upon those charges, yet the undisputed evidence shows that in all his preparations for going out upon the tracks to his work, the foreman complied with the rules of the company and exercised all the care that could be expected or required of one in his position under like circumstances. The passenger train he usually followed was late. He located this train and the freight train, and his conclusion was that he had ample time to reach the point at which the repair work was being done. But even if this was not so, it is apparent that the work of repair, and reaching the points where repairs are required to be made, must be accomplished between the

running of trains, and those engaged in this kind of work know this. *Coyne* v. *Union Pac. Ry. Co.*, 133 U. S. 370, 10 S. Ct. 382, 33 L. Ed. 651.

The use of the motor car for transporting the crew was the accustomed manner and means of going to and coming from the work, known to the plaintiff, and participated in by him for weeks, without objection or complaint. He was acquainted with the track and its curves. So that, as to all these things involving dangers to a certain degree though they did, there is no act of negligence shown to aggravate the danger; they were dangers incident to the employment, and the plaintiff assumed the risk as to them.

Coming now to consideration of the evidence as to which there is a conflict, as above set out, and upon which the plaintiff rests his case, we feel justified in saying that if there were no testimony in the case as to driving the motor car at an excessive rate of speed (thirty to thirty-five miles an hour as the plaintiff estimated this speed), and, *coupled* with that, testimony as to sudden application of the brakes and consequent sudden stopping, and the jury had found a verdict for the plaintiff, it would have been the plain duty of this court to set aside the verdict and enter judgment for the defendant. In other words, as a matter of law, there would have been no negligence on the part of the defendant disclosed by the evidence, and no act which the jury should have been left to pass upon as negligence resulting in injury.

[3] The question as to whether it was negligence to run at a rate of speed in excess of the twenty miles per hour, the maximum speed permitted by the rules of the company, and then to stop suddenly upon meeting a train, will be discussed later. But under ordinary conditions, the meeting of trains and the sudden stopping

to avoid collisions, are dangers which the plaintiff assumed when he accepted employment as a section hand.

In 4 Thomp. Neg., section 4771, it is said: "Railway servants who ride up and down the track upon hand cars assume the risk of coming into collision with trains which they know may come along at that time, or with fast trains which they know to be due; or with 'wild trains' which they know are liable to appear when it is their duty to look out for them and protect themselves from them   *   *   or the risk of injury from the hand car jumping the track, caused by the fact of its being too light, of which fact the injured employee knew or ought to have known in the exercise of ordinary care and judgment."

[4] In 4 Elliott on Railroads (3d ed.), section 1862, the author says: "Ordinarily, section men or trackmen assume the risk incident to running of trains, whether extra trains or trains running on schedule time. Such employees are bound to know that regular trains may be delayed and pass at uncertain intervals, and that wild trains may be sent out over the road, and they assume the risks of danger therefrom."

The cases supporting the law, both State and Federal, are almost unlimited in number. Among them are *B. & O. R. Co.* v. *Baugh*, 149 U. S. 368, 13 S. Ct. 914, 37 L. Ed. 772; *Hammond* v. *Ry. Co.*, 83 Mich. 334, 47 N. W. 965; *Coyne* v. *Union Pac. Ry. Co.*, 133 U. S. 370, 10 S. Ct. 382, 33 L. Ed. 651.

[5] It follows as a natural sequence that if a section hand or trackman assumes the risk of meeting trains, he assumes the risk of the ordinary jerk resulting from sudden stopping to avoid collision with an approaching train. He would not assume the risk of danger arising from extraordinary jerks occasioned by the operation of the motor truck, unless the negligence and the danger arising therefrom were obvious.

[6, 7] But, ignoring the question of excessive speed for the present discussion, stopping as quickly as possible upon meeting a train under the circumstances disclosed by the facts of the instant case (if the motor car was proceeding at a rate of speed of from fifteen to twenty miles per hour) would not result in an extraordinary jerk. There would be some danger attached to stopping suddenly even at that rate of speed, but the jerk so occasioned would be an ordinary one, the danger from which the plaintiff assumed as well as the risk of meeting trains en route to his work, and all other ordinary dangers incident to his employment.

Again, in the absence of negligence on the foreman's part as between the danger resulting from sudden stopping in order to avoid collision, and the danger from collision with the train which the plaintiff testified was right upon them when he discovered it, and called out to Minter, the latter was confronted by a sudden emergency, brought about through no fault of his, and even if his judgment was erroneous this was not negligence.

This is known as the doctrine of "error *in extremis*," and it has been frequently approved in Virginia. *Richmond Ry. & Elec. Co.* v. *Hudgins*, 100 Va. 409, 41 S. E. 736; *Walton* v. *Miller*, 109 Va. 210, 63 S. E. 458, 132 Am. St. Rep. 908; *Pond* v. *N. & W. Ry. Co.*, 111 Va. 735, 69 S. E. 949; *Wise Terminal Co.* v. *McCormick*, 104 Va. 400, 51 S. E. 731.

In *Gumz* v. *Chicago, St. P. & M. R. Co.*, 52 Wis. 672, 10 N. W. 11, where a gang of track hands under a section foreman, working with a hand car, were surprised by the approach of a train around a curve and through a cut, and as a result one of the crew was killed, it appeared that here were two or three lines of action, any one of which might have been taken, and the foreman, compelled to choose one of them on the instant, did so

.in good faith. It was held that the mere fact that it was afterwards found that he had not chosen the best means of escape was not sufficient to charge him (and indirectly the company) with negligence.

The court said: "It may be that the section foreman had the option of a safer course than the one he adopted; but, even then, we should not impute negligence to such mere error of judgment. Such mere error of judgment does not have within it the elements of negligence. We conclude, therefore, that where there are two or more different lines of action, any one of which may be taken, and a person of ordinary skill, in the presence of imminent danger, is compelled immediately to choose one of them, and does so in good faith, the mere fact that it is afterwards ascertained by the result that his choice was not the best means of escape, cannot be imputed to him as negligence." See also Thompson on Negligence, section 4477; *Coyne* v. *Union Pacific Ry. Co.*, 133 U. S. 370, 10 S. Ct. 382, 33 L. Ed. 651.

It is obvious from what has been said that under ordinary conditions the plaintiff assumed the risk of meeting trains and of the ordinary jerk from stopping suddenly upon meeting them.

[8] While the plaintiff's testimony as to the speed (thirty to thirty-five miles per hour) at which the motor car was running was an estimate, yet he also testified very positively that "Mr. Minter was running awfully rapid," he thought to keep out of the way of the passenger train. This testimony was objected to, but we think that the fact that the witness could not definitely fix the speed of the car went to the weight of his testimony and not to its admissibility. And while it is true the plaintiff, among all the witnesses who testified, was the only witness who stated that the motor car was exceeding fifteen miles per hour, still his testimony was not

mere scintilla evidence upon this point. It was his version of what happened and he had a right to have the jury say whether they believed it or not, whether they accepted his theory or that of the defendant.

[9] Assuming, therefore, that the foreman, Minter, was running at an unusual rate of speed, a speed of more than twenty miles an hour, which according to the rules of the railroad company was the maximum speed permitted, and assuming he was running at from thirty to thirty-five miles an hour, as estimated by the plaintiff, and, under these circumstances, met a train close upon him when it was discovered, and suddenly applied his brakes, thereby causing an extraordinary and unusual jerk, and by reason of this the plaintiff was thrown forward upon the track, run over and injured; then the defendant was guilty of negligence (Elliott on Railways, 3d ed., volume 4, section 1843), which was the proximate cause of plaintiff's injury, for which the defendant is responsible in damages, unless the plaintiff by his conduct assumed the extraordinary risk. *Harness v. B. & O. Ry. Co.*, 86 W. Va. 284, 103 S. E. 866; *Chicago, etc., Ry. Co. v. Ward*, 252 U. S. 18, 40 S. Ct. 276, 64 L. Ed. 430; *Keathley v. C. & O. Ry. Co.*, 85 W. Va. 173, 102 S. E. 244; *Jones v. Norfolk Sou. Ry. Co.*, 176 N. C. 260, 97 S. E. 48; *Weldon v. S. A. L. Ry. Co.*, 177 N. C. 176, 98 S. E. 375; *Va. Ry. Co. v. Bell*, 115 Va. 429, 79 S. E. 396, Ann. Cas. 1915A, 804.

In the first named case the court said: "That the movement of a freight train generally is accompanied by jerks of greater or less severity, is a matter of common observation, but an employee lawfully boarding such a train at a proper place has the right to assume that he will not be subjected to extraordinary or unusual jerks."

And so the plaintiff here, while he assumed the risk of stopping suddenly when meeting trains, and the danger

arising from the ordinary jerk incident thereto when the speed was within the company's rules, yet he had a right to assume that he would not be subjected to extraordinary or unusual jerks resulting from sudden stopping while driving at high speed.

The rule of assumption of the risk, therefore, is that an employee assumes all the ordinary risks incident to the employment. He also assumes such extraordinary risks as are plain and obvious. He does not assume risks arising from the master's negligence, or from the negligence of fellow servants (under the Federal employers' liability act), unless they are obvious, or he knows of them and appreciates them and continues in the service.

[10, 11] In *S. A. L. Ry. Co.* v. *Horton*, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A., 1915C, 1 Ann. Cas. 1915B, 475, it is said: "It seems to us that section 4 of the employers' liability act, in eliminating the defense of assumption of risks in the cases indicated, quite plainly evidences legislative intent, that in all other cases such assumption shall have its former effect as a complete bar to the action. At common law the rule is well settled that the servant assumes extraordinary risks incident to his employment or risks caused by the master's negligence *which are obvious or fully known and appreciated by him.*"

In *C. & O. Ry. Co.* v. *DeAtley*, 241 U. S. 310, 36 S. Ct. 564, 60 L. Ed. 1016, the court said: "According to our decision the settled rule is not that it is the duty of the employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume the employer, or his agents, have exercised proper care with respect to his safety until notified to the contrary, unless

the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them.''

In *Reed's Adm'x* v. *Director General of Railroads*, 258 U. S. 92, 42 S. Ct. 191, 66 L. Ed. 480, the railroad company maintained in its yards certain derailing switches, the purpose of which when set against traffic was to prevent other trains from running on its passenger tracks while occupied by passenger trains. On the day in question, the engineer and the deceased, a brakeman, were taking an engine and freight caboose through the yard, the caboose being ahead of the engine, and the deceased being on the front of the caboose for the purpose of signalling the engineer to stop if the derailing switch was set against the passage of the train. It was so set, but either because of the negligence of the engineer in failing to watch for, or see, the signals of the brakeman, or his failure to heed them, or because of the negligence of the deceased in failing to give them in time, the train did not stop at the derailing switch, but was thrown from the track by the switch, the caboose turning over and crushing the deceased. The court, by McReynolds, J., says: ''Accepting the view that the engineer's negligence was the proximate cause of the fatal injury, the court below (Supreme Court of Pennsylvania) held the decedent had assumed the risks of such negligence, and the master was not liable; citing among other cases, *S. A. L. Ry. Co.* v. *Horton, supra*. This, we think, was error. *S. A. L.* v. *Horton*—often followed—ruled that the Federal employers' liability act did not wholly abolish the defense of assumption of risks as recognized and applied at common law. But the opinion distinctly stated that the first section 'has the effect of abolishing in this class of cases the common law rule that exempted the employer from responsibility for the negligence of a fellow

employee of the plaintiff.' The second employers' liability case [*Mondou* v. *N. Y., N. H. & H. Ry. Co.*, 223 U. S. 1, 49, 32 S. Ct. 169, 56 L. Ed. 327-45] declared that 'the rule that the negligence of one employee, resulting in injury to another, was not to be attributed to their common employer, is displaced by a rule imposing upon the employer responsibility for such an injury as was done at common law when the injured person was not an employee.' And in *Chicago, R. I. & P. Ry. Co.* v. *Ward*, 252 U. S. 18 [40 S. Ct. 275, 64 L. Ed. 430], we said: 'The Federal employers' liability act places a co-employee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risks.' *N. Y., C. & H. R. R. Co.* v. *Carr*, 238 U. S. 260, 35 S. Ct. 780 [59 L. Ed. 1298]; *C. & O. Ry. Co.* v. *DeAtley*, 241 U. S. 310, 313, 36 S. Ct. 564 [60 L. Ed. 1016-19].

"In actions under the Federal act, the doctrine of assumption of risks certainly has no application when the negligence of a fellow servant, which the injured party could not have foreseen or expected, is the sole, direct and immediate cause of the injury."

[12, 13] The question now arising, in the instant case, is whether the plaintiff by his conduct assumed the extraordinary risk of defendant's negligence in driving the motor car at a speed limit beyond the limit prescribed by the rules of the company, applying the brakes suddenly upon meeting a train, and because of the unusual jerk precipitating plaintiff upon the track and running over him.

Was this a question for the jury, or, upon the facts, is it a question of law for the court?

The answer to this question is dependent upon whether there is conflict in the evidence as to whether the negligence of the foreman and the danger arising

therefrom could have been foreseen or expected by the plaintiff, whether it was so sudden that it was not fully known and appreciated by him, or whether the want of care and the danger arising from the negligent act were so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them. *C. & O. Ry. Co.* v. *DeAtley, supra.*

The question of the assumption of the risk is usually one for the jury, but it is otherwise if the evidence discloses facts upon which reasonable minds are not likely to differ. *Brown* v. *Riverside Coal Co.*, 143 Iowa, 662, 120 N. W. 732, 28 L. R. A. (N. S.) 1260, 21 Am. Neg. Rep. 646; *McDonald* v. *Chicago, St. P., M. & O. Ry. Co.*, 41 Minn. 439, 16 Am. Neg. Cas. 357; *B. & O. R. Co.* v. *Baugh*, 149 U. S. 368, 13 S. Ct. 914, 37 L. Ed. 772; *Hammond* v. *Railroad Co.*, 83 Mich. 334, 47 N. W. 965.

The facts upon which we must determine this question in the instant case are testified to by the plaintiff; there is no other testimony in the record as to them. He alone testified as to a speed of from thirty to thirty-five miles per hour and the sudden stopping, while going at that speed, upon meeting the freight train. He does not say when Minter began running at this rate of speed, but presumably from the time he left Palmyra, because the plaintiff says he was running "awfully rapid" to keep out of the way of the passenger train, he thought thirty or thirty-five miles an hour, when the usual rate of speed according to all the testimony was from twelve to fifteen miles an hour. So we have the plaintiff's own statement that he was fully conscious of the rate of speed at which Minter was going and the reason for the excessive speed at which he was going, but we have no evidence of any protest on the plaintiff's part. On the contrary he participated in all that was done, had ample time to appreciate what was an ob-

vious departure from the rules and customs and the dangers arising therefrom.

In *B. & O. R. Co.* v. *Baugh, supra,* Baugh, the plaintiff, was employed as a fireman on a locomotive which was manned by the plaintiff and one Hite as engineer. The locomotive was what was called in the testimony a "helper." The custom was for the locomotive to leave Bellaire, Ohio, attached to a freight train, which it helped to the top of the grade about thirty miles west of that point. At the top of the grade the helper was detached and then returned alone to Bellaire. There were two ways in which it could return in conformity to the rules of the company, one on the special orders of the train dispatcher at Newark and the other following some regular schedule train carrying signals to notify trains coming in the opposite direction that the helper was following it. This method was called in the testimony "flagging back." On the day of the accident, without special orders and not following any scheduled train, the helper started back to Bellaire, and on the way collided with a regular local train, and in the collision Baugh was injured.

The court held that the plaintiff was not entitled to recover on two grounds: (1) That the alleged negligence of the engineer was that of a fellow servant of the plaintiff; and (2) that the plaintiff assumed the risk of the collision. Of course, the fellow servants doctrine has been abolished under the Federal employers' liability act, but the doctrine of assumption of risks as above shown is still applicable to the Federal act in its original and undiminished force, save in the one instance not pertinent here.

In the opinion of the court, at page 390 (13 S. Ct. 922), the case of *Hammond* v. *Railway Company,* 83 Mich. 334, 47 N. W. 965, was cited with approval, the

court saying: "The party injured (in the *Hammond Case*) was a section hand, who was injured while riding on a hand car, in company with a fellow laborer and the section foreman, and the negligence claimed was in propelling the hand car along a curved portion of the track, with knowledge of an approaching train, and without sending a lookout ahead to give warning. In respect to this Mr. Justice Cahill, speaking for the court, says: 'But if the conduct was negligent, it was participated in by Hammond. The latter had been going up and down this section of the road daily for three months. * * * Where, as in this case, the sole act of negligence relied on is participated in and voluntarily consented to by the person injured, with full knowledge of the peril, the question of the master's liability does not arise.'

"So in this case Baugh, equally with the engineer, knew the peril, and with this knowledge voluntarily rode with the engineer on the engine. He assumed the risk."

[14] And so it seems plain that, in the instant case, the plaintiff assumed the extraordinary risk of the foreman's negligence, and that this assumption of the risk is a bar to his recovery.

This court will, therefore, enter judgment for the defendant and dismiss the notice of motion at the cost of the plaintiff.

*Reversed.*

UPON A PETITION TO REHEAR.

May 28, 1925.

BY THE COURT.

We are of opinion to deny a rehearing in this case for the following reasons:

[15] The case was submitted to the jury solely upon the question as to whether the defendant in error assumed the risk of meeting trains while going to and from his work upon the notor car. We reached the conclusion that under the instructions asked for by the plaintiff and given by the court, and under the testimony upon which those instructions were based, that as a matter of law defendant in error assumed the risk.

There was only one instruction asked for by the plaintiff in the trial court, which presented his theory of the case and set out the acts of alleged negligence upon which he relied. That instruction tells the jury:

"The court instructs the jury that if you believe from the evidence that the plaintiff, Curtis Powell, was at the date of the accident, in the employ of the defendant as a section hand on its road bed near Wildwood, and that the defendant furnished a motor car operated by its section foreman to transport plaintiff and other members of the section force to and from their work on said road bed; then it became the duty of the defendant to exercise reasonable care in operating and running said car to carry said plaintiff safely to his place of work and to avoid injuring him; and if you shall believe from the evidence that the defendant failed to exercise such reasonable care in the operation of said car, but stopped or attempted to stop the car so suddenly that the plaintiff was thrown, or fell, in front of the car, the car passing over his body, and by reason thereof the plaintiff was injured, then you should find for the plaintiff such damages as he has suffered, or will suffer, from such injuries.

The defendant asked for only one instruction upon his theory of the case, viz.:

"The court instructs the jury that if they believe from the evidence that the plaintiff, Curtis Powell, was riding on the motor car on the morning in question, and

in coming around the bluff or embankment the occupants of the car saw a freight train coming down upon them, and the driver of the motor car suddenly put on the brakes of the car in order to avoid a collision with the train, thereby causing the plaintiff to fall off the motor car or jump off the same in front of the said motor car, so that the motor car thereby ran over the plaintiff, injuring him, then the court instructs the jury that such an accident was one of the assumed risks of the plaintiff's employment, and the jury must find for the defendant."

This instruction the trial court refused. In other words the trial court held as a matter of law that under the state of facts drawn in issue by the two instructions the plaintiff below did not assume the risk.

We based our opinion upon the *Hammond Case* (*Hammond* v. *Railway Company*), 83 Michigan, 334, 47 N. W. 965, cited with approval by the U. S. Supreme Court in *B. & O. R. Co.* v. *Baugh*, 149 U. S. 368, 13 S. Ct. 914, 37 L. Ed. 772. In that case the court said:

"* * * * The party injured (in the *Hammond Case*) was a section hand, who was injured while riding on a hand car, in company with a fellow laborer and the section foreman, and the negligence claimed was in propelling the hand car along a curved portion of the track, with knowledge of an approaching train, and without sending a lookout ahead to give warning. In respect to this, Mr. Justice Cahill, speaking for the court, said: 'But if the conduct was negligent, it was participated in by Hammond. The latter had been going up and down this section of the road daily for three months. Whatever hazard there was in such position was known to him, and he must be held to have voluntarily assumed it. * * * Where, as in this case, the sole act of negligence relied on is participated in and voluntarily con-

sented to by the person injured, with full knowledge of
the peril, the question of the master's liability does not
arise.'

"So in this case Baugh, equally with the engineer, knew
the peril, and with this knowledge voluntarily rode with
the engineer on the engine. He assumed the risk."

We think this decision is controlling in the case under
consideration.

[16, 17] Stress is laid in the petition for rehearing
upon the foreman's alleged negligence in going upon the
track with his motor car ahead of the passenger train
and in the face of an approaching freight train, and this
is alleged as a violation of some rules of the company
requiring the foreman to find out the location of trains
before going on the track. No violation of rules is any-
where charged in the pleadings nor is there any proof of
rules or violation thereof established by the evidence.
This question was not submitted to the jury by instruc-
tion as alleged negligence, either as a single act of negli-
gence resulting in injury, or as associated with the al-
leged negligence upon which the jury was instructed,
and must be considered as waived, as were other allega-
tions of negligence set out in the notice of motion. The
jury cannot be turned loose to find a defendant guilty of
any negligence which might be based upon a breach of
any duties charged in the declaration, *Director General*
v. *Pence's Adm'x*, 135 Va. 329, 116 S. E. 351, when the
court has given all the instructions asked for by the
plaintiff setting out his theory of his case and no men-
tion is made of such charges of negligence in the instruc-
tion.

[18, 19] While it is true that the question whether the
defendant was absolved from negligence because he was
forced under the circumstances to act in emergency, was
not raised in the trial court, yet upon a motion to set

aside a verdict as contrary to the law and the evidence, if it appears in the appellate court that the facts proven in the court below established a case, *as a matter of law*, where the defendant was, without his fault, forced to act in an emergency, and an accident occurred resulting in injury to another, the appellate court would set the verdict aside although no mention was made in the trial court of the doctrine of error in *extremis*.   The instant case, however, was not decided upon that doctrine by this court.   It was discussed in connection with one theory of the case advanced in argument.   It is true that as a rule the application of the doctrine of "error in *extremis*" is one for the jury when the evidence is conflicting.

*Rehearing denied.*