# Richmond.

## NORFOLK AND WESTERN RAILWAY COMPANY v. A. L. SMITH.

January 17, 1929.

The opinion states the case.

*Gilmer & Wysor* and *W. B. Kegley*, for the plaintiff in error.

*J. H. Rhudy, John S. Draper* and *John W. B. Deeds*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

Norfolk and Western Railway Company complains of a judgment for $3,500.00 rendered against it in favor of A. L. Smith, for personal injuries negligently inflicted upon him by the company.

The parties will be referred to by name, or as plaintiff and defendant, according to their positions in the trial court.

On October 6, 1925, A. L. Smith, the plaintiff, was an employee of the defendant as carpenter foreman in charge of a group of men who were repairing bridge No. 250 located on defendant's main line about two-and one-half miles west of the town of Pulaski, Virginia. Smith and his men slept in the camp cars near the freight station in Pulaski yards. He and they, fifteen in number, traveled to and from bridge No. 250 on a motor car, with trailer, which was driven over the tracks of the company. The dispatcher's telephone, over which Smith spoke, is near the east end of the siding south of the Pulaski freight station, about 100 or 150 yards from where his motor car was that morning. Just before starting to his work he called up dispatcher Kerr, at Roanoke, who was in charge of, and who controlled the movement of, trains on that division of the defendant's railway. This is his account of what then occurred:

"Q. Did you get the dispatcher?

"A. Yes, sir; I got the dispatcher, the dispatcher answered me.

"Q. When the dispatcher answered, what did you say?

"A. I said: 'This is A. L. Smith, West End Pulaski, carpenter foreman. I want to go to bridge 250, with a motor car and trailer,' and had I stopped there that would have been amply sufficient.

"Q. What did you do then?

"A. Inasmuch as No. 52 was about Granite Siding up there I said: 'Where is 52, what have you coming east?'

"Q. You said: 'Where is 52'—but you first informed him that you were A. L. Smith?

"A. Yes, sir; the carpenter foreman.

"Q. And you notified him that you wanted to go with your crew to bridge 250?

"A. Yes, sir.

"Q. And you said that would have been sufficient; why did you say that?

"A. Because when I told him where I wanted to go it was his absolute business to tell me what he had coming and to give me the lay-out of the trains; that is his business and not mine.

"Q. We are not concerned with that, but what did you ask him then?

"A. I asked him where No. 52 was.

"Q. And what did he tell you?

"A. He said 52 would be at Grubb for No. 41.

"Q. What train is 52?

"A. That is a train that is due there about 7:30.

"Q. A freight or passenger train?

"A. A freight train.

"Q. And he told you that No. 52 would meet 41 at Grubb?

"A. Yes, sir.

"Q. What did you then ask him?

"A. Someone broke in and used the phone for a little bit and No. 41 passed, which kept me from hearing at that time and when I could hear him again I said, 'Well, what have you to say,' and he said: '41 ought to be by there now,' and: I said 'Yes, sir; she is by here, and I am gone,' and I took my finger off the button and listened for quite a bit to see if he had anything else to say and inasmuch as he didn't say anything more, I hung up the receiver and went on.

"Q. Did he mention about second No. 90 at all?

"A. No, sir.

"Q. Are you positive of that?

"A. He said nothing about second 90."

If the dispatcher failed to notify Smith of the whereabouts of second 90 then he, and through him the railway, was negligent, and if this negligence was the occasion of Smith's injury, then the defendant. is liable. The dispatcher's account, on direct examination, of this conversation is as follows:

"Q. Will you now please detail to the jury just what took place in that conversation between you and Mr. Smith?

"A. On the morning in question, Mr. Smith called me. up and asked me for a lay-out, and I gave him the lay-out as I usually. gave the lay-out, and which I had done heretofore, of all trains that was due in that vicinity.

"Q. Just detail what you did give him; what information you did give him?

"A. I told him No. 52 would be at Grubb or Wytheville for No. 41; No. 72 on the usual time, and the reason why we say 'usual time,' some days No. 52 gets into Pulaski earlier than other days on account of maintenance work, that is, unloading stone and things of that description.

"Q. All right, go ahead.

"A. And No. 71 out of Pulaski 7:55. That was on time or the schedule leaving time, and I think I made mention of No. 41 to Mr. Smith, and he told me that train was just by and I told him that second No. 90 was about Pulaski.

"Q. Second 90 about Pulaski?

"A. Yes, sir."

In his cross-examination these statements appear:

"Q. And you gave him that general lay-out for information for work on the bridge?

"A. Yes, sir.

"Q. And not for the movement of the trains. Now you told him or he told you that No. 41 was in Pulaski, didn't he?

"A. He told me that 41 just passed there; yes, sir.

"Q. And just before or just after he told you that, you told him that second 90 was about Pulaski, didn't you? That is true isn't it?

"A. Yes, sir."

The telephone used on this occasion is a one way instrument. When Smith was talking to Kerr no noise over it could reach Smith from Kerr's end of the line, or from intermediate points; and while Kerr was talking to Smith, no noise from its Pulaski end or from intermediate points could reach Kerr; this was made possible by the use of a push button device, with which the telephone was equipped.

The dispatcher keeps on a rack, in view, a train sheet on which all movements of trains are recorded. Their movements are under his immediate control and without it their operation would be impossible. This sheet is so placed that it is in plain view when the telephone is in use. The dispatcher states that his independent recollection of what occurred is fortified by the fact that he was told of the accident soon after it had happened and for that reason had occasion to remember all that he said in connection with the train that did the damage.

It was Smith's duty to ascertain as near as possible where all trains were before starting to his work. *Davis* v. *Powell*, 142 Va. 711, 125 S. E. 751, 128 S. E. 242, made so by the company's regulations and by common sense. He was familiar with the rules for such cases made and provided. That one immediately applicable is known as Rule 693 and reads as follows:

"When practicable, before starting on a trip, the motorman should inform himself as to time of overdue trains, specials, etc., and ascertain if traffic is normal by communicating with the nearest telegraph operator or dispatcher."

It was Smith's duty to ask for this information and it was Kerr's duty to give it.

In the recent case of *White* v. *Southern Ry. Co.*, 151 Va. 302, 144 S. E. 424, Prentis, C. J., restated a familiar rule in this language: "Substantial conflicts in testimony must be submitted to a jury, but where there is no real conflict, juries should decide questions of fact in accordance with the testimony submitted."

Applying it to the facts here, if there was substantial conflict about what the dispatcher said to Smith relative to the movements of the train known as second No. 90, then the judgment of the trial court should not be disturbed. If there is no such conflict, and if it appears from the evidence that the necessary information was given, then that judgment is erroneous and must be reversed.

Smith's evidence, as we have seen, is to the effect that while he was talking with the dispatcher, local freight train No. 41 passed, "which kept me from hearing at that time."

It is quite clear that much may have been said while this local freight train was passing the Pulaski station, and it is equally clear that Smith knew he was missing a part of that conversation. He knew that he could not hear but Kerr did not have any such knowledge, and there was nothing to put him on notice that a repetition of cautions was necessary. Kerr does not, and in the nature of things could not, undertake to state with exactness the order in which information as

to the movement of different trains was given, but he does say that with the train sheet immediately before his eyes, and just before or just after he had stated the whereabouts of train No. 41, he told him that second 90 was about at Pulaski. His testimony on this point is positive and unequivocal. Smith's evidence to the effect that no such statement was made amounts to no more than this: He said that he did not hear it, and that during this conversation, while a freight train was passing he could hear nothing at all. This testimony is negative in character and entitled to little weight. Suppose it were measured by another rule. If it could be established by unquestioned evidence that the dispatcher did tell Smith about second 90, could Smith be convicted of perjury? Certainly not. He would answer: "I never heard it. It must have been made when freight train No. 41 was passing when I could not hear at all." Such an answer would be conclusive. *White* v. *Southern Ry. Co.*, *supra.*

Since there is no conflict in this evidence, there is nothing upon which a jury could base a verdict of guilty predicated on negligence. Smith's own gross negligence was the sole proximate cause of his injury; he assumed the risk.

Other errors have been assigned, but having reached the conclusion that the defendant was not negligent at all, and because they present no questions of public interest, their discussion would be unprofitable.

For the reasons indicated, the judgment of the trial court must be reversed and the case dismissed. It is so ordered.

*Reversed.*

WEST, J., dissenting.